**In re OMEGAS GROUP, INC., Debtor.**

**XL/DATACOMP, INC., Plaintiff–Appellant/Cross–Appellee,**

v.

**John R. WILSON, Trustee, Defendant–Appellee/Cross–Appellant.**

Nos. 92–5922, 92–5934.

United States Court of Appeals, Sixth Circuit.

Argued June 15, 1993.

Decided Feb. 18, 1994.

Philip W. Collier, Michael D. Risley (argued and briefed), Stites & Harbison, Louisville, KY, for XL/Datacomp, Inc.

John R. Wilson (argued), Ruck, Wilson & Cooper, Louisville, KY, Jonathan D. Goldberg, Cathy S. Pike, Goldberg & Simpson, Louisville, KY, J. Baxter Schilling (briefed), Louisville, KY, for John R. Wilson.

Before: GUY and BATCHELDER, Circuit Judges, and MILES, Senior District Judge.*

BATCHELDER, Circuit Judge.

Understandably, creditors of bankrupt debtors often feel like restaurant patrons who not only hate the food, but think the portions are too small.[1] To press the analogy, they also don't like having to wait in line for a table, possibly being seated only to find out the kitchen has just closed. The bankruptcy court is a little like a soup kitchen, ladling out whatever is available in ratable portions to those standing in line; nonetheless, scarcity begets innovation in the hungry creditor's quest to get a little more than the next fellow. This case involves just such an effort. The creditor claimed the debtor defrauded it, and argued before the bankruptcy court, with partial success, that money paid to the debtor in the course of a business transaction was held in constructive trust since the debtor knew bankruptcy was imminent but assured the creditor otherwise. The district court agreed with this disposition. Since we hold that the bankruptcy court erred in applying the law of constructive trust to this bankruptcy situation, we reverse.

## I.

While the parties do not generally dispute the underlying facts of this case, they do characterize them quite differently. Both parties, XL/Datacomp (Datacomp) and debtor Omegas[2] (Debtor or Omegas) were "industry remarketers" (IRs) of "mid-range" IBM computers. The companies had "IR contracts" with IBM that enabled them to purchase IBM hardware at a discount, custom-tailor software for an individual purchaser, and then sell the "value-added" system to the retail purchaser.

In early 1990, the two companies entered into a course of business dealings that Datacomp describes as a "unique relationship" and a "type of joint venture" and which the Debtor describes as a "clandestine relationship." Both parties agree that Omegas agreed to act as a middleman of sorts, ordering IBMs on behalf of Datacomp, taking a percentage down payment, ordering the computers, then taking the rest of the payment and sending full payment to IBM at the time of delivery.

According to the Debtor, in early 1990, IBM paid Datacomp $8 million to terminate its IR agreement and sign on to a new IR agreement, which would eliminate the "competitive advantage which existed between the IRs and IBM's regular sales force." In order to come up with a new source of competitively priced IBMs, the Debtor explains, Datacomp approached Omegas (as well as other IRs still operating under the old IR agreements) and proposed that Omegas supply Datacomp with new IBM computers in exchange for a 4% of gross price commission. IBM would not know of this arrangement. Indeed, the Debtor claims that since Datacomp, as the purchaser from Omegas, the IR, would not be the "end-user" of the computers, this deal violated Omegas's IR agreement with IBM; for this reason, the Debtor points out, most of the transaction was arranged orally.

According to Datacomp, Omegas initially proposed this arrangement with Datacomp as a means to save itself from financial ruin. Datacomp explains that due to a misappropriation of funds within Omegas, Omegas owed IBM Credit Corp. (ICC) over $1.8 million. ICC declared the credit line to be in default on April 27, 1990. Omegas arranged a repayment schedule with ICC, but had to increase its volume of computer sales in order to make the payments. However, Ome-

---

\* The Honorable Wendell A. Miles, Senior United States District Judge for the Western District of Michigan, sitting by designation.

1. Attributed to Woody Allen in *Annie Hall* (United Artists Entertainment 1977), but possibly dating from the Mesozoic Era.

2. While the trustee is now the actual party to this litigation, for clarity's sake we refer to his side as Omegas or Debtor. Omegas initially filed its bankruptcy petition under Chapter 11. The case was converted to a Chapter 7 liquidation in April 1991. The decision of the bankruptcy court appealed here was rendered during the Chapter 11 proceedings.

gas's order backlog with IBM had reached the limit IBM permitted it, some $1.5 million.

Datacomp stresses that while Omegas was initiating this deal with Datacomp, it at no time disclosed to Datacomp any of these goings-on with ICC. Datacomp describes Omegas's relationship to it as "fiduciary," with Datacomp relying on Omegas's trustworthiness and on the truth of its representations. The problems arose, Datacomp argues, because of Omegas's inability to convince IBM to lift or extend the firm ceiling on Omegas's credit line with ICC; without such an extension, Omegas could not process the orders Datacomp had placed. Omegas claims that ICC orally promised it a credit increase to $15 million at the time repayment was arranged, and that the Omegas principals/shareholders signed personal guarantees covering the $15 million credit line.

Between August 6 and 15, 1990, Datacomp sent Omegas orders for new IBM computers and down payments totalling $259,137. On August 29, Omegas sent Datacomp invoices totalling $618,759; Datacomp sent Omegas $587,763 by September 10. Shortly thereafter, Datacomp sent Omegas the balance due on the computers it had ordered; the total it paid reached $1,149,042. On September 12, Omegas's President, Jeffery Sanford, ordered the termination of all payments to IBM for computers on order. On September 19, representatives from the two companies met in Chicago; at the meeting Omegas informed Datacomp of its "financial problems," and that Omegas was considering the option of filing bankruptcy. At the meeting, Omegas suggested that Datacomp lend it $1.6 million, which loan would, according to Omegas, "remove the prospects of bankruptcy ... and allow [it] to fulfill its contractual agreements with Datacomp." Datacomp describes this suggestion as being more of a demand: "Omegas was holding Datacomp's funds and would not pay IBM unless Datacomp loaned Omegas [the money]."

After the meeting, Datacomp's counsel sent Omegas a letter accusing Omegas of fraud and demanding the return of the money already paid. On October 15, without Datacomp's knowledge or consent, Omegas requested that IBM cancel all deliveries.

Omegas claims that this cancellation was necessary to render IBM's 5% cancellation fee a prepetition debt.

Omegas filed bankruptcy on October 16, 1990. Datacomp filed its complaint in this adversary proceeding in the bankruptcy court on October 26, 1990, seeking to recover the $1.1 million it paid Omegas by arguing that Omegas's fraud rendered all money it received pursuant to the deal subject to a constructive trust in Datacomp's favor, and thus not part of the bankruptcy estate, citing 11 U.S.C. § 541(d).

After an expedited bench trial, the bankruptcy court held that Datacomp could recover $302,142 as held in a constructive trust by Omegas. In short, the bankruptcy court found that Datacomp entered into the agreement described above with Omegas, establishing a relationship which it characterized as "in a sense a joint venture," and that, while Omegas was having some difficulty sorting out its credit line with IBM, things went more or less according to plan for a while. The court found, however, that on September 12, 1990, Jeffery Sanford, the president of Omegas, "realized he was in serious financial straits with IBM" and that Omegas would not be able to complete the deal. The court found that "on September 12, [sic] 13th and/or 14th," Sanford terminated all further payments to IBM, but that after those dates Omegas continued to invoice Datacomp for the computers on order, and deposited a Datacomp check on September 17th. The court concluded that on September 12, "Sanford realized that Omegas was not going to be able to operate in its ordinary course of business with regard to its dealings with Datacomp," and that this development gave rise to an affirmative "duty to disclose its financial problems to Datacomp." The court therefore imposed a constructive trust on "all funds received [by Omegas] after September 12."

Datacomp moved to amend the judgment to recover the full amount it had paid; the court denied this motion on February 13, 1991. The parties cross-appealed, the debtor seeking reversal and Datacomp continuing to argue that the entire amount paid should be included in the constructive trust and exclud-

ed from the Debtor's estate. The district court affirmed on June 16, 1992.

## II.

■ On appeal from district court review, this Court reviews a bankruptcy court decision for clear error as to findings of fact, and de novo as to conclusions of law. Bankr.R. 8013; *Martin v. Bank of Germantown (In re Martin),* 761 F.2d 1163, 1166 (6th Cir.1985). The court accords discretion in reviewing only the original bankruptcy court findings, not those included in the decision rendered by the district court, since "[t]his court is 'in as good a position to review the bankruptcy court's decision as is the district court.' " *In re G.S.F. Corp.,* 938 F.2d 1467, 1474 (1st Cir.1991) (quoting *Sambo's Restaurants, Inc. v. Wheeler (In re Sambo's Restaurants, Inc.),* 754 F.2d 811, 814 (9th Cir.1985)).

## III.

### A.

The bankruptcy court's disposition of Datacomp's action, and the district court's affirmance, left no one satisfied. On appeal, Datacomp defends the judgment of the bankruptcy court, but argues that the court should have imposed the constructive trust on the entire amount of funds it tendered to Omegas prior to Omegas's filing for bankruptcy. Under Kentucky law, Datacomp contends, money "wrongfully" appropriated from an innocent party does not become the property of the recipient, but is considered to be held in constructive trust for the benefit of the aggrieved party. Datacomp maintains that it did not have merely a debtor/creditor relationship with Omegas, but a joint venture arrangement that imposed fiduciary duties on Omegas, which Omegas breached. From the start, Omegas misrepresented its financial state and its ability to provide Datacomp with the computers it wanted; as its situation worsened and IBM made it crystal clear that no more computers would be forthcoming, Datacomp asserts, Omegas made no effort to inform Datacomp of the impending disaster, knowing all the while that Datacomp would continue in good faith to send its checks on

time. Datacomp points out that the Bankruptcy Code provides that "[p]roperty in which the debtor holds ... only legal title and not an equitable interest ... becomes property of the estate ... only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold." 11 U.S.C. § 541(d). Datacomp argues that since by definition it has an equity interest in any funds held by Omegas in constructive trust, these funds are properly designated as remaining outside the bankrupt estate, and should therefore be returned to Datacomp rather than being incorporated into the estate and divided amongst the creditors.

Omegas, on the other hand, thinks its situation prior to bankruptcy was no different from that of the typical business threatened with insolvency. As Omegas tells the tale, its principals thought the deal with Datacomp would pull it out of financial danger. While the numbers seemed to work as the companies put the deal together, problems arose with getting IBM to process delivery of the computers Omegas ordered on behalf of Datacomp, and IBM Credit ultimately refused to permit Omegas to increase its credit line so this could be accomplished. By the time its principals recognized that Omegas was sinking faster than they could bail, Omegas could not return Datacomp's money or take other action to avoid immediate loss to its other creditors due to the Bankruptcy Code's prohibition of preferential transfers immediately prior to filing for bankruptcy. Omegas denies that its principals committed fraud on Datacomp; instead, it maintains that all its people did was to try, in good faith, to salvage the deal until the last possible moment, and only then take prudent measures, as advised by counsel, to prepare for bankruptcy. To characterize this as fraud giving rise to a constructive trust, Omegas argues, does not comport with the Bankruptcy Code's system of equitable and orderly distribution of the debtor's assets; Omegas claims that Datacomp is not materially different from any other disappointed creditor.

Omegas also argues that the fishy nature of Datacomp's attempt to keep getting IBM computers at a favorable rate through Omegas's still-valid IR agreement renders Datacomp's hands "unclean," thus preventing it from seeking the equitable remedy of constructive trust. Datacomp also knew about the straits Omegas was in, the Debtor contends; Datacomp took advantage of this knowledge in getting Omegas to agree to this "clandestine relationship," but also knowingly assumed the obvious risk that Omegas might fold before the deal was done.

### B.

■ Nowhere in the Bankruptcy Code does it say, "property held by the debtor subject to a constructive trust is excluded from the debtor's estate." Title 11 U.S.C. § 541 defines the estate in bankruptcy broadly, including "all legal or equitable interests of the debtor in property as of the commencement of the case," § 541(a)(1), and "any interest in property preserved for the benefit of or ordered transferred to the estate under [the trustee's "strongarm" or "avoiding" powers as provided in] section 510(c) or 551 of this title," § 541(a)(4). However, § 541(d) provides that

> [p]roperty in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, such as a mortgage secured by real property ... becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

Courts, including the bankruptcy court in this case, which have excluded property from a debtor's estate as being subject to constructive trust, have done so on the authority of § 541(d), usually over the protestations of trustees asserting their strongarm powers.

For example, in *Vineyard v. McKenzie (In re Quality Holstein Leasing)*, 752 F.2d 1009 (5th Cir.1985),[3] Clayton McKenzie, the president and whole owner of a company, Quality Holstein Leasing (QHL), bought a private airplane, arranging the financing through Borg–Warner. McKenzie registered the plane in his own name. After two years, he decided he wanted a new plane, so he traded in the old one. Borg–Warner arranged to transfer its security interest to the new aircraft, but apparently botched this effort. By the time Borg–Warner got its act together, McKenzie had transferred title of the new plane to QHL, and QHL had filed for Chapter 11 reorganization.

When QHL's bankruptcy trustee sought to sell the plane, Borg–Warner informed the court that it had the right to recoup the value of its original lien from the sale proceeds. It argued that either McKenzie or QHL had defrauded it, and that therefore under applicable state law the new plane was subject to a constructive trust. Assets held in constructive trust, Borg–Warner argued, did not become incorporated into the debtor's estate. The *Quality Holstein Leasing* court ultimately held in favor of the trustee, since Borg–Warner could properly assert no rights to the aircraft or proceeds of its sale based on QHL's having defrauded McKenzie, a bizarre allegation[4] the court was forced to deduce from the rather disorganized contentions put forth by Borg–Warner. "[A]ny

3. Ironically, *Quality Holstein Leasing* is considered one of the leading cases analyzing constructive trusts in bankruptcy, *see, e.g.,* Emily L. Sherwin, *Constructive Trusts in Bankruptcy,* 1989 U.Ill.L.Rev. 297 (1989); Carlos J. Cuevas, *Bankruptcy Code Section 544(a) and Constructive Trusts,* 21 Seton Hall L.Rev. 678, 687 (1991), despite the fact that it had no reason to reach that issue on the facts of the case and on the grounds upon which its ultimate holding rested. However, its oft-cited dicta makes it the logical choice as an example of how courts in general have been looking at the issue.

4. *See Quality Holstein Leasing,* 752 F.2d at 1011 n. 5. The court noted that Borg–Warner had failed to allege with any particularity who had perpetrated the fraud. Essentially inventing an argument for Borg–Warner in order to proceed with its analysis, the court suggested that "[t]o assert a claim at all ... Borg–Warner must argue that QHL defrauded McKenzie." *Id.* at 1011. While recognizing that the possibility of McKenzie's own company fooling him seemed "most doubtful," the court accepted this contention for the purposes of summary judgment, since "resolution of the issue would involve factual questions" inappropriate for summary judgment disposition. *Id.*

fraud by QHL upon McKenzie conferred on Borg–Warner no [additional] rights." *Id.* at 1015.

In discussing Borg–Warner's constructive trust argument, the *Quality Holstein Leasing* court observed a conflict between the trustee's strongarm powers under 11 U.S.C. § 544, and § 541(d)'s exclusion of "equitable interest[s]" in the debtor's property from the debtor's estate. *Id.* at 1012. The court noted that a constructive trust is one such "equitable interest," and that under § 541(d) constructive trusts are generally held to be superior in interest to the trustee, strongarm powers notwithstanding. *Id.* at 1013 ("Congress did not mean to authorize a bankruptcy estate to benefit from property that the debtor did not own."). The court "found" that the bankruptcy and district courts "erred in concluding that section 544 empowers a bankruptcy trustee to retain for the benefit of the estate property that the debtor obtained by fraud and upon which state law has imposed a valid constructive trust." *Id.* at 1015.

■■■ The problem with the Fifth Circuit's analysis in *Quality Holstein Leasing,* and with the analyses of the vast majority of courts which have addressed bankruptcy claims based on constructive trust, is that a constructive trust is not really a trust.[5] A constructive trust is a legal fiction, a common-law remedy in equity that may only exist by the grace of judicial action. As Professor Sherwin writes,

> [t]he constructive trust remedy developed in equity, by analogy to the express trust arrangements in which one person holds legal title to property for the benefit of another. The same concept of separate legal and beneficial interests in property suggested a remedy for unjust enrichment: if, under principles of unjust enrichment,

the defendant holds title to property that ought to belong to the plaintiff, the court will treat the defendant as a trustee, holding title for the plaintiff's benefit. At that point, however, the analogy to an express trust ends. The result of a constructive trust is a judicial decree ordering the defendant to convey the property to the plaintiff. . . . A constructive trust is merely a means by which the court can say that the defendant must relinquish to the plaintiff property that represents an unjust enrichment.

Sherwin, *supra* note 3, at 301. The distribution of assets in a bankruptcy case is based on an identification of what assets and liabilities the debtor has "as of the commencement of the case," this being the exact moment the debtor files. *Shirkey v. Leake,* 715 F.2d 859, 863 (4th Cir.1983). A debtor that served prior to bankruptcy as trustee of an express trust generally has no right to the assets kept in trust, and the trustee in bankruptcy must fork them over to the beneficiary. However, a claim filed in bankruptcy court asserting rights to certain assets "held" in "constructive trust" for the claimant is nothing more than that: a claim. Unless a court has already impressed a constructive trust upon certain assets or a legislature has created a specific statutory right to have particular kinds of funds held as if in trust,[6] the claimant cannot properly represent to the bankruptcy court that he was, at the time of the commencement of the case, a beneficiary of a constructive trust held by the debtor.

Thus, the essence of the argument put forth by Borg–Warner and similarly situated claimants goes as follows: "Judge, due to debtor's fraud (or whatever), our property rights as beneficiaries of the constructive trust arose prepetition. Therefore, we stand not in the position of unsecured creditors,

---

5. Even courts that have criticized *Quality Holstein Leasing* seem to make the same erroneous assumption. *See, e.g., Belisle v. Plunkett,* 877 F.2d 512, 513 (7th Cir.1989) ("A constructive trust ordinarily survives bankruptcy: the property [held in trust] may not be used to satisfy the debtor's obligations to other creditors. . . ."). In one extreme example, an appeals panel appeared virtually heedless of any potential difference between express and constructive trusts whatsoever. *See Connecticut General Life Ins. Co. v. Uni-*

*versal Ins. Co.,* 838 F.2d 612, 618 (1st Cir.1988) ("When a debtor is in possession of property impressed by a trust—express or constructive—the bankrupt estate holds the property subject to the outstanding interest of the beneficiaries.").

6. The legislatures of a number of states have created such a right with regard to construction funds paid to contractors. *See* discussion *infra* p. 1451.

nor even equal to the trustee in the position of judgment creditors, but as the rightful owner of the *res* held in trust. Oh, and by the way, would you mind conferring on us these ownership rights and declaring that they arose prepetition?" This may seem silly phrased in this manner, but it is exactly the argument that most courts have accepted in holding that, due to some prepetition breach or bad act by the debtor, the claimed property or money is subject to a constructive trust and therefore "did not come into the bankruptcy estate and must be returned to the [debtor]." *Sommer v. Vermont Real Estate Inv. Trust (In re Vermont Real Estate Inv. Trust),* 25 B.R. 813, 817 (Bankr.D.Vt.1982); *see also City Nat'l Bank of Miami v. General Coffee Corp. (In re General Coffee Corp.),* 828 F.2d 699, 704 (11th Cir.1987) ("[W]e agree with the district court that the constructive trust in favor of [claimant] came into existence before the bankruptcy proceedings began.").

Datacomp points out, correctly, that property rights in bankruptcy are determined only by reference to the state law of the jurisdiction. Datacomp further claims that under Kentucky law, Omegas's alleged fraud would give rise to a constructive trust imposed over all the money Omegas took unlawfully from Datacomp.[7] What Datacomp, the bankruptcy court, the district court, and a number of other courts have failed to consider is that just because something is so under state law does not necessarily make it so under the Bankruptcy Code. As this court has previously noted, "[w]hile the nature and extent of the debtor's interest are determined by state law[,] 'once that determination is made, federal bankruptcy law dictates to what extent that interest is property of the estate.'" *Bavely v. IRS (In re Terwilliger's Catering Plus, Inc.),* 911 F.2d 1168, 1172 (6th Cir.1990) (quoting *N.S. Garrott & Sons v. Union Planters Nat'l Bank of Memphis (In re N.S. Garrott & Sons),* 772 F.2d 462, 466 (8th Cir.1985)). Ultimately, "state law must be applied in a manner consistent with federal bankruptcy law." *Torres v. Eastlick (In re North Amer-*

---

7. Inasmuch as the bankruptcy court followed existing precedent in permitting Datacomp's claim to go forward based on a constructive trust argument, it did not err in looking to Kentucky law, since the existence of parties' property rights in bankruptcy depends on state law. *See, e.g., Butner v. United States,* 440 U.S. 48, 54, 99 S.Ct. 914, 917, 59 L.Ed.2d 136 (1979). However, Kentucky law on constructive trusts is at best unclear, particularly outside the context of real estate transactions. The bankruptcy court compounded the confusion by "finding" that the relationship between Datacomp and Omegas was "in a sense a joint venture ... not a typical debtor-creditor relationship" and at another point describing it as a "confidential relationship." It would seem beyond dispute that Omegas was to buy computers from IBM and sell them to Datacomp at a profit, and that Datacomp was to forward the purchase money to Omegas as it came due. Omegas's and Datacomp's working behind IBM's back, possibly in violation of Omegas's IR agreement with IBM, does not turn this into a "confidential relationship" giving rise to fiduciary and other duties between the parties. Nor does the fact that both Omegas and Datacomp stood to make some money transform the arrangement into a "joint venture ... for the purpose of gaining profits." Kentucky law requires joint adventurers to share risk, share profits, and share control over the activities pursued in the venture. *See Eline Realty Co. v. Foeman,* 252 S.W.2d 15, 17 (Ky.1952) (joint venture is "a combination of money, efforts, skill or knowledge, a joint control between the parties in the undertaking, and a sharing of profits or losses."). The relationship between Omegas and Datacomp therefore can be characterized properly only as a debtor-creditor relationship. Again, since Kentucky law does not say for certain whether a debtor-creditor relationship may give rise to a constructive trust, the bankruptcy court's clear error in finding a joint venture does not rule this out. The absence of fiduciary duties between debtors and creditors surely makes a finding of constructive trust much less likely, particularly considering that the bankruptcy court found that Omegas had committed, not intentional, premeditated fraud, but had fraudulently misrepresented its deteriorating financial position by simply failing to disclose these problems to Datacomp. We also note that Kentucky follows the common law in recognizing the "unclean hands" doctrine as an absolute bar to claims in equity. *See Eline Realty,* 252 S.W.2d at 19. If Omegas is correct in its assertion that Datacomp intended to defraud IBM by purchasing computers through Omegas, Datacomp cannot prevail in any equitable claim against Omegas. "In all cases involving moral delinquency or turpitude, all parties participating are deemed to be in pari delicto." *Id.* Because of our more general conclusion that, absent a specific state statute to the contrary, constructive trusts are not properly invoked to gain superpriority over the trustee in bankruptcy, we ultimately need not resolve these state law issues.

*ican Coin & Currency, Ltd.), 767 F.2d 1573, 1575 (9th Cir.1985).

We cannot find a more succinct manner of making our point than did Judge Aspen of the Northern District of Illinois: "[A] constructive trust is fundamentally at odds with the general goals of the Bankruptcy Code." *The Oxford Organisation, Ltd. v. Peterson (In re Stotler and Co.),* 144 B.R. 385, 388 (1992). Quoting a Texas opinion, the judge explained:

> The reluctance of Bankruptcy Courts to impose constructive trusts without a substantial reason to do so stems from the recognition that each unsecured creditor desires to have his particular claim elevated above the others. Imposition of a constructive trust clearly thwarts the policy of ratable distribution and should not be impressed cavalierly.

*Stotler,* 144 B.R. at 388 (quoting *Neochem Corp. v. Behring Int'l, Inc. (In re Behring Int'l, Inc.),* 61 B.R. 896, 902 (Bankr.N.D.Tex. 1986)). We now see and raise Judge Aspen. We think that § 541(d) simply does not permit a claimant in the position of Datacomp to persuade the bankruptcy court to impose the remedy of constructive trust for alleged fraud committed against it by the debtor in the course of their business dealings, and thus to take ahead of all creditors, and indeed, ahead of the trustee. Because a constructive trust, unlike an express trust, is a remedy, it does not exist until a plaintiff obtains a judicial decision finding him to be entitled to a judgment "impressing" defendant's property or assets with a constructive trust. Therefore, a creditor's claim of entitlement to a constructive trust is not an "equitable interest" in the debtor's estate existing prepetition, excluded from the estate under § 541(d).

We do not address here property already impressed with a constructive trust by a court in a separate proceeding prepetition, in which case the claimant would be entitled to priority (although not superpriority to the trustee) as a secured creditor by virtue of the judgment. *See* 11 U.S.C. § 506. Nor do we address property that a state by statute has declared to be held in trust for particular purposes, such as builders trust funds created by statute in many states to remedy specific problems in the construction industry. *See Selby v. Ford Motor Co.,* 590 F.2d 642 (6th Cir.1979). We recognize that there is dicta in *Selby* noting that various courts have held that "[i]n the absence of statute ... construction funds in the hands of a contractor are held subject to a constructive trust or an equitable assignment or an equitable lien." *Id.* at 648. However, the specific issue in *Selby* was how to treat a statutory state builders trust under the Bankruptcy Act, and the cases cited to support the more general proposition that a constructive trust could be imposed in the absence of a state builders statute are unique to the construction industry. The *Selby* case, and the cases cited therein, are limited in application to the specific exigencies of the construction industry.

Datacomp claims that Omegas defrauded it. If that be the case, then the Code already provides a remedy. The Code specifically excepts from discharge "any debt ... for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by ... false pretenses, a false representation, or actual fraud," 11 U.S.C. § 523(a)(2)(A), as well as "any debt ... for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny," *id.* § 523(a)(4), and "any debt ... for willful and malicious injury by the debtor to another entity or to the property of another entity," *id.* § 523(a)(6). The purpose of § 523(a)(2)(A), according to the leading treatise, is "to prevent the bankrupt from retaining the benefits of property acquired by fraudulent means." 3 *Collier on Bankruptcy* ¶ 523.08[1], at 523–46 (quoting *Rudstrom v. Sheridan,* 122 Minn. 262, 142 N.W. 313 (1913)). Section 523(a)(4) disallows the debtor from escaping liability for property it obtained through actual fraud, *viz.,* "misrepresentation, falsehood, trick or deceit," or through "defalcation," which is "broader than 'embezzlement' and probably broader than 'misappropriation.'" *Id.* ¶ 523.14[1][a–b], at pp. 523–102–03. And § 523(a)(6) preserves liability for debts resulting from the debtor's intentional torts, such as conversion, where the "wrongful act ... necessarily produces

harm and is without just cause or excuse." *Id.* at ¶ 523.16[1].

So why would a creditor who thinks the debtor has defrauded him bother to base his claim on constructive trust? The answer is simple: it is harder to prevail by arguing that a debt is nondischargeable. For example, to prove an exception under § 523(a)(2)(A), the creditor must prove

> that the debtor obtained money through a material misrepresentation that at the time the debtor knew was false or made with gross recklessness as to its truth. The creditor must also prove the debtor's intent to deceive. Moreover, the creditor must prove that it reasonably relied on the false representation and that its reliance was the proximate cause of loss.

*In re Phillips,* 804 F.2d 930, 932 (6th Cir. 1986). Although the creditor need only prove his reliance by a preponderance of the evidence, *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), the bankruptcy court must construe all exceptions to discharge "strictly," with the benefit of any doubt going to the debtor. *In re Ward,* 857 F.2d 1082, 1083 (6th Cir.1988). A second, and certainly more compelling reason to avoid pursuing a claim under § 523, is that the creditor who prevails in proving his debt to be nondischargeable comes away from the bankruptcy proceeding with only his debt intact; he has no more assurance than he did prepetition that the debtor, having reorganized or otherwise received its "fresh start," will ever pay him back. On the other hand, if the creditor successfully argues that he "owns" the money or property owed him since the debtor's fraud gave rise to a constructive trust, the creditor walks away with

his debt fully satisfied, leaving the rest of the creditors to squabble over the remnants.[8]

### C.

■ The equities of bankruptcy are not the equities of the common law. Constructive trusts are anathema to the equities of bankruptcy since they take from the estate, and thus directly from competing creditors, not from the offending debtor.[9] "Ratable distribution among all creditors" justifies the Code's placement of the trustee in the position of a first-in-line judgment creditor and bona fide purchaser for value, empowered to avoid certain competing interests (and even to nullify the debtor's "preferential" prepetition payments to otherwise entitled creditors) so as to maximize the value of the estate. To a party defrauded by the debtor, incorporating the proceeds of fraud in the debtor's estate may seem like allowing the "estate to benefit from property that the debtor did not own." *Quality Holstein Leasing,* 752 F.2d at 1013. But as the Seventh Circuit has pointed out, "allowing the estate to 'benefit from property that the debtor did not own' is exactly what the strong-arm powers are about: they give the trustee the status of a bona fide purchaser for value, so that the estate contains interests to which the debtor lacked good title." *Belisle v. Plunkett,* 877 F.2d 512, 516 (7th Cir.1989) (criticizing *Quality Holstein Leasing* ). The Code recognizes that each creditor has suffered disappointed expectations at the hands of the debtor; for this reason, it makes maximization of the estate the primary concern and entitlement to shares of the estate secondary. Imposing a constructive trust on the debtor's estate impermissibly subor-

---

**8.** As mentioned in note 2, *supra,* Omegas's bankruptcy was converted from Chapter 11 to Chapter 7 during the pendency of this appeal. Inasmuch as the constructive trust would now be asserted against assets to be finally liquidated, we believe our arguments against the propriety of its application to be even stronger.

**9.** Indeed, since constructive trust is a remedy employed to prevent "unjust enrichment" on the part of the defrauding party, to use the estate's funds to restore a defrauded claimant violates this principle, since it permits the defrauder to get away scot-free. Once the debtor files his

petition, he cares little, if at all, who gets what from the estate. While a creditor prevailing on a claim that a debt is nondischargeable due to fraud must wait longer for satisfaction, at least the party responsible for the fraud remains liable for the debt, thus preserving the punitive aspect of a constructive trust imposed outside bankruptcy. Even viewed from the perspective that the bankruptcy courts' highest goal is promoting equity (not a proper view, as explained *infra* ), constructive trusts therefore have no place in bankruptcy.

dinates this primary concern to a single claim of entitlement.[10]

■ Bankruptcy courts have believed themselves justified in imposing constructive trusts and ladling out portions of debtors' estates' assets because they are traditionally "courts of equity." *See, e.g., Quality Holstein Leasing,* 752 F.2d at 1012. However, "whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code." *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 206, 108 S.Ct. 963, 969, 99 L.Ed.2d 169 (1988); *see also Childress v. Middleton Arms, L.P. (In re Middleton Arms, L.P.),* 934 F.2d 723, 725 (6th Cir.1991) (bankruptcy court's equitable powers "may only be used in furtherance of the goals of the Code"). As the Ninth Circuit noted in *In re North American Coin & Currency, Ltd,*

> [w]e necessarily act very cautiously in exercising such a relatively undefined equitable power in favor of one group of potential creditors at the expense of other creditors, for ratable distribution among all creditors is one of the strongest policies behind the bankruptcy laws.

767 F.2d 1573, 1575 (1985). As we have endeavored to explain, § 523 of the Code specifically provides the remedy of declaring nondischargeable debts arising from various types of fraud and deceit committed by the debtor. The Code endows the trustee with generous powers to bring property of imperfect title or disputed ownership into the debtor's estate for distribution according to each creditor's ability to prove its entitlement and priority in accordance with the dictates of the Code. To permit a creditor, no matter how badly he was "had" by the debtor, to lop off a piece of the estate under a constructive trust

theory is to permit that creditor to circumvent completely the Code's equitable system of distribution.

## IV.

In light of these provisions and in light of the overall purposes of the Code, § 541(d) cannot properly be invoked as an equitable panacea whenever the bankruptcy court thinks a claimant has been particularly burdened by a debtor's bad faith or bad acts. Since the bankruptcy court here erred in doing so, the judgment of the district court affirming the bankruptcy court's judgment is **REVERSED.**

RALPH B. GUY, Jr., Circuit Judge, concurring in the result.

Although I concur in the result reached by the court, I would travel a different route to reach that result.

Section 544(a) of the Bankruptcy Code (11 U.S.C. § 544(a)) establishes the so-called "strong-arm" power of a trustee in bankruptcy. It

> gives a bankruptcy trustee the rights and powers of a judicial lien creditor or a bona fide purchaser of real property and allows the trustee to avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by a judicial lien creditor or a bona fide purchaser of real property. This section therefore permits the trustee to bring property of the debtor into the bankruptcy estate.

*In re Crabtree,* 871 F.2d 36, 37 (6th Cir.1989).

This strong-arm power, however, sometimes comes in conflict with the provisions of section 541(d) of the Bankruptcy Code (11 U.S.C. § 541(d)). Section 541(d)

---

**10.** Not surprisingly, the record of this very case provides us with a perfect example of how constructive trusts burden not the offending debtor, but only competing creditors. Other creditors of Omegas's had apparently also argued their claims under constructive trust theories; when the bankruptcy court found in favor of Datacomp, Omegas decided to settle with them. The court approved these settlements, but declared that if Datacomp were to prevail on appeal in arguing that more, or all, of the funds it tendered to Omegas were held in constructive trust, and if

Omegas's bank account could not satisfy such judgment, these other creditors might be "required to disgorge a portion of the funds paid to them" in settlement. This disgorgement illustrates the weakness of the fiction that the constructive trusts existed prepetition. If all of the settled claims were constructive trusts in their own right, the funds never became property of the bankruptcy estate. Why then would they be subject to disgorgement because of Datacomp's constructive trust?

excludes certain equitable interests from the bankruptcy estate; it provides that property in which the debtor holds only legal title and not an equitable interest (such as a mortgage) becomes property of the estate only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

*Id.* at 37–38.

The federal courts have differed in their resolution of the apparent conflict between section 544(a) and section 541(d). Some courts

> have held ... that § 541(d) prevails over the trustee's strong-arm powers under § 544(a). Other courts have rejected this approach, holding that sections 541(d) and 544(a) operate independently; specifically, these courts have reasoned that § 541(d) does not limit the trustee's avoidance powers under § 544(a) but instead qualifies § 541(a), which specifies the interests of the debtor in property that comprise the bankruptcy estate.

*Id.* at 38 (citations omitted).

The bankruptcy trustee would have us embrace the latter position, contending that Congress did not intend the extent of the strong-arm power to be narrowed by section 541(d). He argues that to deprive the bankruptcy estate of funds that state law might find subject to a constructive trust, especially one created post-petition, would be to ignore the priorities set out in the Bankruptcy Code to the detriment of the debtor's other unsecured creditors. *See In re North American Coin & Currency, Ltd.,* 767 F.2d 1573 (9th Cir.1985). The trustee emphasizes that, in the instant case, Omegas commingled Datacomp's money with over $1,600,000 of money it received from other sources. Many of these deposits were from creditors that prepaid for goods or services to be provided by Omegas. None of these other creditors were afforded special protection by the bankruptcy court.

Datacomp, however, asserts that the trustee's powers as a judicial lien creditor are not as substantial with regard to personal property as they would be as a hypothetical bona fide purchaser of real property. *See In re*

*Mill Concepts Corp.,* 123 B.R. 938 (Bankr. D.Mass 1991); *In re Storage Technology Corp.,* 55 B.R. 479, 484 (Bankr.D.Colo.1985) ("The law is clear in Colorado that, with regard to personalty, a beneficiary of a constructive trust or other equitable lien prevails over a judicial lien creditor. The law may be different with regard to realty, but for personal property the rule has remained unchanged for almost ninety years...").

Even if, *arguendo*, we were to accept Datacomp's characterization of the bankruptcy trustee's powers, this would be of little help to plaintiff. Those circuits which have determined that the force of section 544(a) is overcome by a constructive trust created consistent with section 541(d) have only so held as to those trusts which came into being *prepetition*. "Where state law impresses property that a debtor holds with a constructive trust in favor of another, and the trust attaches prior to the petition date, the trust beneficiary normally may recover its equitable interest in the property through bankruptcy court proceedings." *Matter of Quality Holstein Leasing,* 752 F.2d 1009, 1013–14 (5th Cir.1985); *see also Universal Bonding Ins. Co. v. Gittens & Sprinkle Enters., Inc.,* 960 F.2d 366, 372 (3d Cir.1992); *In re Howard's Appliance Corp.,* 874 F.2d 88, 95 (2d Cir.1989) ("[W]e need not concern ourselves with whether section 544 of the Bankruptcy Code would mandate a result contrary to the one we reach today since the constructive trust imposed here attached prior to the filing of the Chapter 11 petition." (citation omitted)); *In re N.S. Garrott & Sons,* 772 F.2d 462, 467 (8th Cir.1985) ("The estate succeeds to only such title and rights in the property as the debtor had at the time the petition was filed.").

It is well established that "[o]ne must look to state law ... to determine whether to impose a constructive trust on property within the debtor's possession." *In re Howard's Appliance Corp.,* 874 F.2d at 93; *see also In re Terwilliger's Catering Plus, Inc.,* 911 F.2d 1168 (6th Cir.1990). State law also defines the point at which property held by the debtor has been subjected to such a trust.

There appears to be no ruling of the Kentucky Supreme Court which addresses the issue of whether a constructive trust arises at the time of the wrongdoing or at the time of the judgment imposing the trust. However, "[a] federal court applying state law is bound to adhere to decisions of the state's intermediate appellate courts absent some persuasive indication that the state's highest court would decide the issue otherwise." *Silverberg v. Paine, Webber, Jackson & Curtis, Inc.*, 710 F.2d 678, 690 (11th Cir.1983).

After the district court affirmed the decision of the bankruptcy court, the Kentucky Court of Appeals, in *Commonwealth Cabinet for Human Resources v. Security of America Life Insurance Co.*, 834 S.W.2d 176 (Ky.Ct. App.1992), held that a lien creditor has priority over a constructive trust beneficiary, if the lien creditor's interest attached to the property before the court created the constructive trust.[1] The *Security of America* court concluded that "the constructive trust being a creature of equity did not come into existence until it was created by court order." *Id.* at 180–81. *See also Borg–Warner Acceptance Corp. v. First Nat'l Bank of Prestonsburg*, 577 S.W.2d 29 (Ky.App.1979).

Accordingly, the most authoritative expression of Kentucky law provides that a constructive trust only comes into being at the time of its judicial creation. Therefore, at the time of debtor's bankruptcy filing, Datacomp did not have an equitable interest in the deposits it paid to Omegas. As this was so, the bankruptcy trustee's section 544(a) strong-arm power could not have been compromised by the operation of a post-petition constructive trust. The trust created by the bankruptcy court in the case at bar must be dissolved and the funds contained within committed to Omegas' bankruptcy estate.

---

1. Datacomp contends that we need not follow *Security of America* because there are earlier cases which arguably reach an inconsistent result. However, I believe that under the factual circumstances presented here the most recent pronouncement of the Kentucky Court of Appeals is the one we should apply. The cases relied upon by Datacomp are distinguishable.