In re Susan Marie FLINT, Debtor.

Susan Marie Flint, Plaintiff,

v.

United Student Aid Funds, Inc., Defendant.

Bankruptcy No. 96–20245.
Adversary No. 97–2106.

United States Bankruptcy Court,
E.D. Michigan,
Northern Division.

Feb. 23, 1999.

Paul I. Bare, Traverse City, MI, for plaintiff.

Todd Chamberlain, Lansing, MI, for defendant.

### OPINION ON WHETHER A CONSOLIDATION LOAN IS AN EDUCATIONAL LOAN

ARTHUR J. SPECTOR, Bankruptcy Judge.

### Introduction

On October 7, 1995, Susan Flint signed a promissory note in favor of Arizona Educational Loan Marketing Corporation. ("AELMAC"). The principal amount of the note was $4,422.70. In consideration for the note, AELMAC paid two obligations owed by Flint to the U.S. Department of Education (the "DOE loans"). The parties agree that both of the original loans enabled Flint to attend college.

Flint and her husband filed a joint petition for chapter 7 bankruptcy relief on February 22, 1996. Both of the original loans first became due more than seven years before Flint filed bankruptcy. On September 11, 1997, Flint commenced this adversary proceeding, seeking a determination that the AELMAC obligation is dischargeable under 11 U.S.C. § 523(a)(8)(A).

An answer was filed by United Student Aid Funds, Inc., which had acquired AELMAC's rights under the note pursuant to a guarantee obligation. United did not dispute Flint's contention that the DOE loans are subject to discharge. It did, however, counterclaim for a determination that the note obligation is excepted from discharge by § 523(a)(8). Flint filed an answer asking that the relief requested in the counterclaim be denied.

This core proceeding, see 28 U.S.C. § 157(b)(2)(I), was tried on August 7, 1998. This opinion comprises our finding of facts and conclusions of law. See F.R.Civ.P. 52(a) (incorporated by F.R.Bankr.P. 7052).

### I. Is the AELMAC Loan "An Educational ... Loan?"

Section 523(a) provides:

A discharge under section 727 ... does not discharge an individual debtor from any debt—

...

(8) for an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship, or stipend, unless—

(A) such loan, benefit, scholarship, or stipend overpayment first became due more than 7 years ... before the date of the filing of the [bankruptcy] petition....

11 U.S.C. § 523(a)(8)(A). For simplicity's sake, we will use the term "educational loan" in referring to an obligation which falls within the scope of this statute.

■ Flint does not dispute that the original DOE loans were educational loans. And United does not dispute that those loans "first became due" more than 7 years prepetition. The issue which is disputed is whether the obligation to AELMAC (which, of course, did become due within 7 years of the bankruptcy) constitutes an "educational loan." [1]

■ The Bankruptcy Code includes no definition of an educational loan. It is clear, though, that the sine qua non of such a loan is that the proceeds are used "for educational purposes." In re Merchant, 958 F.2d 738, 741 n. 2 (6th Cir.1992) (quoting In re Shipman, 33 B.R. 80, 82, 9 C.B.C.2d 490 (Bankr. W.D.Mo.1983)). See also In re Segal, 57 F.3d 342, 347 (3rd Cir.1995). Thus we must

---

1. The original issue was whether the 7 years ran from the date(s) when the original loans became due or when the new loan became due. In light of the substantial case authority for the latter view, the Court previously announced its determination that United's position that its loans first became due less than 7 years before the bankruptcy was filed was correct. However, that resolution begged the question of whether what United held was an "educational loan."

decide if the payment of a pre-existing educational loan fits that criterion.

There are cases which support United's position on this issue. *See, e.g., Hiatt v. Indiana State Student Assistance Comm'n,* 36 F.3d 21, 23–24 (7th Cir.1994); *In re Rudnicki,* 228 B.R. 179 (6th Cir. BAP 1999); *United States v. McGrath,* 143 B.R. 820, 822 (D.Md.1992), *aff'd,* 8 F.3d 821 (4th Cir.1993) (per curiam; unpublished; available on Westlaw); *In re Meeker,* 225 B.R. 910, 913 (Bankr.N.D.Ohio 1998); *In re Stricklen,* 224 B.R. 905, 906, 33 B.C.D. 217 (Bankr.E.D.Ark. 1998); *In re Hull,* 223 B.R. 876, 878 (Bankr. W.D.N.Y.1998); *In re Black,* 221 B.R. 887, 888 (Bankr.M.D.Fla.1997); *In re Cobb,* 196 B.R. 34, 38 (Bankr.E.D.Va.1996); *In re Saburah,* 136 B.R. 246, 251 (Bankr.C.D.Cal. 1992). In nearly all of these cases, however, the court simply assumed or asserted without analysis that a loan which refinances an educational loan is itself educational. The only exception among the cases cited is *Cobb,* and even there the rationale is poorly explained: "The ... loan served to pay off and alter the terms of the initial education loan and thus created a new obligation relative to the reason for the debt. The essential purpose of the [new loan] ... was the repayment and restructuring of a debt incurred to pay the costs of higher education." *Cobb,* 196 B.R. at 38.

*Cobb* seems to be arguing that the purpose of a refinancing loan is defined by the purpose which the original obligation served. But the court does not explain, nor is it readily apparent, why that should be so. Suppose, for example, that A borrows money from B at 5% interest to pay off a car loan which calls for interest at a rate of 10%. A's only "purpose" in borrowing from B is to get a more favorable interest rate. To assert that the purpose of the new loan was to buy a car ignores reality.

The result in *Cobb* and the other cases cited could be defended on the theory that the lender who pays off a loan is analogous to an assignee of the original lender's rights. In either case, the argument goes, the new party has in effect stepped into the shoes of the original lender.

The problem with this argument is that, like other creditors in this context, United stresses that its rights are *not* derivative of the original lender(s). Rather, United argues, the Debtor's obligation to it is distinct from the old obligations—which have been satisfied and no longer exist.

■ Of course, United emphasizes this point to deflect Flint's original argument, which was that the debt is outside the 7-year reach-back of § 523(a)(8). *See generally, e.g., In re Salter,* 207 B.R. 272, 275, 37 C.B.C.2d 1428 (Bankr.M.D.Fla.1997) (ruling that "the seven years shall be computed from the date the original obligation became due," reasoning that "there was no new note executed by the Debtor, ... no new funds advanced and the [parties'] stipulation merely rewrote the repayment terms of the original note"). Early on in this proceeding, we expressed our agreement with United and the many cases holding that a new loan restarts the clock. *See, e.g., Hiatt,* 36 F.3d at 25. But United can't have it both ways: Either its rights and duties (and status as an educational lender) were acquired from the original lender(s), or they were not. Having accepted, as we do, the proposition that we are dealing here with an entirely new loan, it would be incongruous to, in effect, treat United as though it were an assignee of the original loans. United's loan must instead sink or swim on its own merits. *See Segal,* 57 F.3d at 348 ("[The lender] ... might stand on firmer ground if, for instance, section 523(a)(8) referred to 'an obligation to repay funds received as *or used to repay* an educational benefit, scholarship, or stipend.' Clearly, though, Congress did not enact such a provision, and neither the plain language of [§ 523(a)(8) ] ... nor the policies which underlie the subsection support such an interpretation.").[2]

2. *Segal's* point is underscored by another provision in § 523(a), which renders nondischargeable a "debt—... incurred to pay a tax to the United States that would be nondischargeable." 11 U.S.C. § 523(a)(14). The fact that there is no analogous provision pertaining to educational loans should not be lightly regarded. *See Touche Ross & Co. v. Redington,* 442 U.S. 560, 571–72, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979) (declining "to imply [a] ... private remedy," noting that the

With regard to this issue, United argued at trial that it "is important ... to remember that [it] ... is a non-profit institution operating a program under the auspices of [20 U.S.C. § 1078–3]." Trial Transcript at p. 11. This point was corroborated by Defendant's Exhibit G, which is an agreement between United and the Associate Commissioner of the Office of Guaranteed Student Loans of the United States Office of Education (at that time a part of the Department of Health, Education and Welfare).[3] That statute, contained in Sub–Chapter IV, Part B, of the Higher Education Act of 1965, 20 U.S.C. § 1001 *et seq.*, establishes an insurance regime for certain loans made "to eligible borrowers for consolidation of their obligations with respect to eligible student loans." 20 U.S.C. § 1078–3(a)(1). Many of the criteria which insurable loans must meet are obviously designed to benefit the borrower. *See, e.g.*, 20 U.S.C. § 1078–3(b)(4)(A) (The consolidation loan must generally be "made without security and without endorsement."); 20 U.S.C. § 1078–3(b)(4)(D) (The borrower must be "entitle[d] ... to accelerate without penalty repayment of the whole or any part of the loan.").

The case which United makes for the Higher Education Act's relevance here goes something like this. A major purpose of § 523(a)(8) is to ensure the financial viability of the federal government's student loan program. Consolidation under § 1078–3 is part and parcel of that program. Accordingly, an important objective underlying § 523(a)(8) would be thwarted were courts to rule that consolidation loans are dischargeable. *See* Trial Transcript at pp. 17–20, 32–33.

Some cases seem to support this line of reasoning. *See Hiatt*, 36 F.3d at 24 (The "court's interpretation furthers the congressional policy by ensuring that a consolidation loan, which is in fact a second government guaranteed student loan debt, is collectible."); *In re Martin*, 137 B.R. 770, 774

(Bankr.W.D.Mo.1992) ("The decision in this case is consistent with the Congressional purpose underlying § 523(a)(8)(A) to preserve the financial integrity of the educational loan system.... Congress adopted consolidation provisions in an effort to reduce defaults by making repayment terms sensitive to the borrower's financial situation."). This Court, however, is unpersuaded.

We are willing to assume that § 1078–3 is an integral part of the student loan program which § 523(a)(8) is designed to protect. *See generally Merchant*, 958 F.2d at 740 (Section 523(a)(8) was enacted to preserve the "availability and solvency of educational loan programs for students."); *In re Nunn*, 788 F.2d 617, 619 (9th Cir.1986) ("Section 523(a)(8)(A) is derived from an amendment to the Higher Education Act of 1965 ...."); *cf.* 20 U.S.C. § 1071(a)(1) ("The purpose of ... [P]art [B] is to ... encourage State and nonprofit private institutions and organizations to establish adequate loan insurance programs for students ... [and] to provide a Federal program of student loan insurance for students or lenders who do not have reasonable access to a State or private nonprofit program of student loan insurance."). Nor do we quarrel with the proposition that the dischargeability of consolidation loans tends to undermine that program.

But these concessions do not warrant the conclusion that United wishes us to reach. The flaw in its argument is that § 523(a)(8) is not monolithic. That statute surely reflects legislative solicitude for the continued viability of the student loan program. That concern, though, was subject to the same countervailing considerations applicable to any proposed exception from discharge, those being "a fresh start for the debtor, and equality of treatment for all debts and creditors." H.R.Rep. No. 95–595, 95th Cong., 1st Sess (1977), U.S.Code Cong. & Admin.News 1978, p. 5787, (*reprinted in* Vol. C *Collier on Bankruptcy* (15th ed. rev.1998) at App.Pt. 4–1229).

---

statute "is flanked by provisions ... that explicitly grant private causes of action," and reasoning that "when Congress wished to provide a private damages remedy, it knew how to do so and did so expressly").

**3.** However, United is merely the assignee of AELMAC. United neither alleged nor proved

that AELMAC is an approved lender under the auspices of that program. Nevertheless, in light of our disposition of this case on other grounds, the Defendant's failure of proof on this point is not material.

■ Given these competing objectives, it obviously would be inappropriate to construe § 523(a)(8) with a "pro-lender" slant. The strong public policy in favor of an honest debtor's fresh start is reflected in the maxim that when "determining whether a particular debt falls within one of the exceptions of section 523, the statute should be strictly construed against the objecting creditor and liberally in favor of the debtor." 4 *Collier on Bankruptcy,* ¶ 523.05 (15th ed.1998). *See also In re Omegas Group, Inc.,* 16 F.3d 1443, 1452 (6th Cir.1994); *In re Watkins,* 90 B.R. 848, 856, 18 B.C.D. 311, 19 C.B.C.2d 678 (Bankr.E.D.Mich.1988). Therefore, when determining the scope of the term "educational loan," we are duty bound to construe it narrowly in favor of Flint. United does not claim that Flint is anything but the honest but unfortunate debtor for whom bankruptcy relief was designed. Thus we cannot make a finding of nondischargeability based on the rationale that doing so is consistent with, or promotes, the congressional "policy" in favor of educational assistance programs.[4]

As mentioned earlier, the critical question here is whether the borrowed funds were used for educational purposes. Since this was a consolidation loan, it may in a broad sense be said to have an educational component. *See supra* p. 615. And perhaps it was this consideration which prompted the Third Circuit to suggest in dictum that such loans are within the scope of § 523(a)(8). *See Segal,* 57 F.3d at 349 n. 8; *cf. Martin,* 137 B.R. at 773 ("[T]he loan ... is an educational loan because it is one governed by the Higher Education Act.").

■ Contrary to what the foregoing cases seem to suggest, we do not believe that consolidation loans are necessarily "edu-

cational" within the meaning of § 523(a)(8). In our view, it requires a rather strained reading of that statute to conclude that it encompasses loans which foster education on a generalized, macro level. A more straightforward interpretation of § 523(a)(8), which we adopt, is that the loan proceeds must be used to pay for the loan recipient's education.[5]

Although the focus in *Merchant* was on the word "loan" as opposed to the word "educational," the test that court established includes this consideration: "did the student receive her education by agreeing to repay the obligation?" Julie J. Heimark, *Playing the "Get Out of College Free" Card: Dischargeability of Educational Debts in Chapter 7 Bankruptcy,* 25 Pepp.L.Rev. 531, 541 (1997). In *Merchant,* the court held that a university's credit extensions to an enrolled student qualified as "educational loans" at least in part because the debtor *"received her education* from the University *by agreeing to pay these sums of money* owed for educational expenses after graduation." 958 F.2d at 741 (emphasis added).

In this case, of course, Flint did not receive her education by agreeing to pay the loan made by AELMAC. Flint had already paid for her education when she received that loan. AELMAC's money did not enable Flint to attend college: Rather, it permitted her to obtain more favorable payment terms on an outstanding financial obligation. *See* Trial Transcript at p. 12 (United's Counsel: "[The loan] accorded to [Flint] ... certain benefits.... [S]he was given a new clock, a new repayment schedule.... [The loan] lowered her monthly payment amount, modified her interest rate, and ... cleared the default flag over her name."). In short, Flint bor-

---

4. If the policy were as strong as United suggests, there would be no conditions on the exception in § 523(a)(8). The nondischargeability of taxes offers an apt analogy. The bankruptcy statute also "demonstrates congressional judgment that certain problems—e.g., those of financing government—override the value of giving the debtor a wholly fresh start." *Bruning v. United States,* 376 U.S. 358, 361, 84 S.Ct. 906, 11 L.Ed.2d 772 (1964). Consequently, "[u]nder the Bankruptcy Code, the IRS is the beneficiary of several specific provisions that reflect Congressional desire to protect the federal fisc." *In re Dever,* 164 B.R. 132, 145 (Bankr.C.D.Cal.1994). Yet § 523(a)(1)

does not except all taxes from discharge. Likewise, the fact that there is a general policy to collect government-backed student loans does not make every such loan in any way connected with schooling *ipso facto* nondischargeable.

5. Just as a car loan is a loan to enable a debtor to purchase a car, a boat loan is one to enable a debtor to purchase a boat, and a home loan is a loan to enable a debtor to purchase a home, an education loan is a loan to enable a debtor to purchase an education.

rowed money from AELMAC for purely financial reasons. We therefore hold that the obligation is not an educational loan for purposes of § 523(a)(8). In doing so, we join those other courts that hold that the test is whether the borrowed funds enabled the debtor to obtain an education:[6] *Segal,* 57 F.3d at 349 ("[The lender] did not provide to Dr. Crowe a means to obtain an education in exchange for the loan. The 'purpose' here was not to facilitate Dr. Crowe's education, which had long since been completed...");[7] *Shipman, supra; In re Ziglar,* 19 B.R. 298, 300, 9 B.C.D. 58, 6 C.B.C.2d 538 (Bankr. E.D.Va.1982) (holding that the loan was not "educational," and observing that the debtor and his wife did not "return[ ] to school after executing the note"). *Cf. Matthews v. Transamerica Fin. Svs. (In re Matthews),* 724 F.2d 798, 800 (9th Cir.1984) (concerning a debtor's § 522(f)(1) right to avoid a nonpurchase money security interest on exempt household goods, the court noted that "[t]he vast majority of courts ... have held that refinancing or consolidating loans by paying off the old loan and extending a new one extinguishes the purchase money character of the original loan because the proceeds of the new loan are not used to acquire rights in the collateral.").

## II. Plaintiff's Motion to Withdraw Admission

This conclusion is apparently at odds with Flint's answer to a discovery request. At the trial, her counsel explained that, "in response to [request for] admission No. 4, ... [Flint] agreed that certain criteria were met by the loan ...—one of which was that this was in fact a student loan." Trial Transcript at p. 6. Flint "move[d] that that admission be allowed to be withdrawn." *Id.* United opposed the motion. *See id.*

The material facts of this case are not in dispute. So in seeking an admission that AELMAC made a "student loan," United can only have been asking Flint to ratify its legal interpretation of those facts. The Court is not bound by such an "admission." *See Swift & Co. v. Hocking Valley Ry. Co.,* 243 U.S. 281, 289, 37 S.Ct. 287, 61 L.Ed. 722 (1917) (Brandeis, J.) ("If the stipulation is to be treated as an agreement concerning the legal effect of admitted facts, it is obviously inoperative.... [T]he court cannot be controlled by agreement of counsel on a subsidiary question of law."); *United States v. Ralston,* No. 89–1360, 1990 WL 251929, at *2 (D.Kan. Dec. 20, 1990) (("[T]he request for admission seeks an admission concerning a purely legal issue. The court is, therefore, not bound by that admission."); *Carswell Trucks, Inc. v. International Harvester Co.,* 334 F.Supp. 1238, 1240 (S.D.N.Y.1971) ("[T]he statement relied on by Harvester is at best an admission of law which is not binding on Carswell....")). Because the discovery response is nonbinding, it is of no significance and no purpose would be served in amending it. Flint's motion will therefore be denied.

Even if we are wrong as a matter of law concerning the consequences of Flint's response, she must still prevail. Rule 36(b) states in pertinent part that "the court may permit withdrawal or amendment [of an admission] when the presentation of the merits of the action will be subserved thereby and the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice that party in maintaining the action or defense on the merits." F.R.Civ.P. 36(b) (incorporated by F.R.Bankr.P. 7036). *See generally Kerry Steel, Inc. v. Paragon Indus. Inc.,* 106 F.3d 147, 154 (6th Cir.1997) ("A 'district court has considerable discretion over whether to per-

6. We hasten to add that we do not rule out the nondischargeability of a loan intended as a student loan but misappropriated by the debtor to some other purpose. That the debtor did not in fact obtain an education by use of the loaned funds does not necessarily disqualify the loan from being an "educational loan." *Compare In re Ealy,* 78 B.R. 897 (Bankr.C.D.Ill.1987); and *In re Vretis,* 56 B.R. 156 (Bankr.M.D.Fla.1985) (test is whether the funds were awarded for edu-

cational purposes) *with Shipman, supra* (test is whether the loaned funds were used for educational purposes).

7. While we recognize that the *Segal* court distinguished consolidation loans under 20 U.S.C. § 1078–3, stating that "courts routinely have viewed [them] as 'educational loans,' " 57 F.3d at 349, n. 8, we previously explained, *supra* at 613–614, why the distinction is unpersuasive.

mit withdrawal or amendment of admissions.'" (citation omitted)).

Whether AELMAC's loan was educational in nature is essentially the only issue here. Hence a "presentation of the merits" of the case would obviously be "subserved" by permitting Flint to contradict her original position on that issue. And United did not allege, much less demonstrate, that it would be prejudiced in any way should the admission be withdrawn.

Nor is there any reason to suppose that prejudice exists. At the pre-trial conference, the Court informed the parties that a key issue to be addressed was whether the obligation to AELMAC could properly be characterized as an educational loan. (Flint's admission was presumably made when she was still proceeding on her original theory of this case—which was that the note payable to AELMAC did not constitute a new obligation. She subsequently abandoned that argument.) United was in fact prepared to, and did, argue this point at trial. Thus this is not a situation in which one side was caught unawares by the other side's change in position. *See generally id.* (" '[T]he prejudice contemplated by [Rule 36(b) ] is not simply that the party who initially obtained the admission will now have to convince the fact finder of its truth.' ... Prejudice under Rule 36(b), rather, 'relates to special difficulties a party may face caused by a sudden need to obtain evidence upon withdrawal or amendment of an admission.'" (citation omitted)).

Since both requirements of Rule 36(b) are satisfied, we hold in the alternative that Flint's motion to amend must be granted. Under either scenario—granting the motion or denying it as moot—the discovery response can have no impact on the outcome of this case.

For the reasons stated, the debt is not excepted from discharge by operation of § 523(a)(8). An appropriate order shall enter.