## FIDELITY & DEPOSIT CO. OF MARYLAND et al. v. HIGHLAND TRUST & SAVINGS BANK et al.

## HIGHLAND TRUST & SAVINGS BANK et al. v. FIDELITY & DEPOSIT CO. OF MARYLAND et al.

### Nos. 5254, 5260.

Circuit Court of Appeals, Sixth Circuit.

Nov. 18, 1930.

Floyd Estill and Vaughn Miller, both of Chattanooga, Tenn. (Miller, Miller & Martin and Strang & Fletcher, all of Chattanooga, Tenn., on the brief), for Fidelity & Deposit Company and others.

J. B. Sizer, of Chattanooga, Tenn. (Sizer, Chambliss & Sizer and R. A. Cogswell, all of Chattanooga, Tenn., on the brief), for Highland Trust & Savings Bank.

Joe V. Williams and Joe Brown, both of Chattanooga, Tenn., for Whitice.

Before DENISON and HICKENLOOPER, Circuit Judges, and TUTTLE, District Judge.

DENISON, Circuit Judge.

Three surety companies were sureties on the official bond of W. A. Whitice, county court clerk at Chattanooga. In January, 1925, it was discovered that he was officially "short" some $60,000, as to public funds belonging, respectively, to state and county. The sureties made good the shortage to the state, and then, by virtue of their right of subrogation, filed this bill in equity against the Highland bank to enforce its alleged lia-

bility on account of public funds which it had received from Whitice in payment of his individual debts to it, or which it had aided him to dissipate. The bill also sought other relief, to be later mentioned. The trial court held the bank liable in the sum of about $2,000, and denied to plaintiffs any further relief. Both parties appeal.

For the first fifteen months of his term, Whitice had carried his funds in two other banks. Then he opened his account with the Highland. It was entered on the bank books as an account with "W. A. Whitice, C. C. C.," these letters indicating "County Court Clerk." Deposits were made usually upon tickets marked with a rubber stamp in the same way, but many were made upon tickets using his name but not these letters. The majority of the checks drawn had the same letters after the signature, but many did not. It was understood between Whitice and the Highland at the beginning that he would use this account both for official and for personal transactions, and that deposits of either class would be received and checks in either form would be paid. It appears very clearly that much the greater part of Whitice's defalcations had occurred before this account was opened, although probably the total was gradually increased during the thirteen months while this account was running. The difficulty of any accurate accounting is much increased because there were constant transfers of official funds, and perhaps of personal funds, back and forth among the three banks; and, doubtless for reasons satisfactory to counsel, the record contains little as to the state of the accounts in the other two banks. Certainly, at the time of opening and continuously during these thirteen months, Whitice was in default to the state in a large amount, and was insolvent, in the complete sense that all of his property was insufficient to pay this obligation to the state.

■ The sureties' first position is that, because of this insolvency, the state had an effective first lien upon all the property of Whitice, including this bank account, so that by virtue of this lien the state could recover from the bank whatever the bank received for itself out of this account, and regardless of whether it is proved or should be presumed that the money so received was public money. This position is based upon the opinion of this court in the somewhat analogous case of U. S. Fidelity & Guaranty Co. v. Union Co., 228 F. 448, which opinion accepted and applied the ruling of the Supreme Court of Tennessee in Fidelity Co. v. Rainey, 120 Tenn. 357, 399, 113 S. W. 397. These cases do not support this theory of lien. They hold only that, where a fund in which the state and others are beneficiaries is to be distributed among the beneficiaries, the state has a priority. It is true that reference is made in our opinion to the "lien" of the state; but, when speaking merely of the distribution of a fund on hand or to be recovered, and considering only the respective rights of the beneficiaries, a priority and a lien are about the same thing.

■ Certainly no lien, as giving rights to or affecting legal title, was involved in or intended to be declared in either of these cases; and the present case must rest upon the ordinary doctrines of courts of equity as to trust funds. Nor, under the facts of the case, can we find any general liability against the bank, on the general ground that it had paid, out of this account, checks to others which were in fact for Whitice's personal use. Maryland Co. v. City National Bank (C. C. A. 6) 29 F.(2d) 662, 663; Empire Co. v. Cahan, 274 U. S. 473, 47 S. Ct. 661, 71 L. Ed. 1158, 57 A. L. R. 921. We do not overlook the fact that the Highland, early in the period, knew that Whitice used official funds in another bank, the Hamilton, to pay his personal debt to the Highland. Non sequitur that it was thereby charged with notice that he was habitually appropriating to his own use official money in the Highland account. The fact must be evidentially appraised in view of the finding that the net Highland actual misappropriation was relatively small, a bit more than 1 per cent. of the total withdrawals.

■ These theories of recovery being disapproved, there remains only the matter of the Highland's liability for what it received in payment of the debts due to itself. In dealing with such a mingled account as this one, and when the personal debts of the trustee to the bank have been paid by checks against such an account, we have decided in the Maryland-City Bank Case that there is no necessary presumption that the trust fund was depleted by such a payment, but that inquiry should be made to ascertain the fact. We do not question that the bank is put on inquiry, and, if the fact turns out to be that the money received by it was, in fact, trust money, it must refund; but, in determining the fact, the settled rules as to following trust funds must be observed. In this case, whatever initial presumption or inference arising from the ultimate shortage there

might be that the funds received by the bank to pay its note were trust funds is fully met by the fact that the bank through its loans to Whitice put into this fund during this period $18,000, and received back out of it only $8,000. Taking this transaction as a whole, the bank was the loser; and it plainly becomes necessary to examine the details. The present record shows an endeavor to get at the facts so as to leave as little as possible to inference. Whitice testifies with unquestioned frankness but with poor recollection. His chief office deputy, who should have had full knowledge of official receipts and disbursements, testifies in detail. It appears that the total deposits in this account during its life were about $176,000, and that out of this sum about $18,000 was made up of loans from the bank to Whitice personally and at once deposited by him therein, thus leaving $158,000. Out of these the deputy is able to identify as official funds deposited $145,000, leaving about $13,000 undetermined. If this were all, it might well be inferred, as against the bank, that this $13,000 constituted official funds; but there is no doubt that many deposits of personal funds were made as Whitice borrowed money from others and made various deals. The clerk's office had a system of recording all official moneys paid in for which receipts were given. The deputy took all such records and traced all such recorded money to its deposit in this or some other bank. There seems to be no theory upon which further official deposits could have been made in this bank, except as Whitice may have received tax or license money and given no receipt. If any such practice prevailed, it would naturally have become known to the sureties at the time when the defalcation became public and their liability was being ascertained, but there is no proof of it excepting in two instances, which are casually mentioned but left undeveloped. With the record in this shape, we think any initial general inference against the bank is fairly met; and that the total of official moneys put into the bank should be considered as $145,-000. The withdrawals which the deputy finds were devoted to official purposes amounted to $143,000. In addition Whitice was entitled to draw out officials funds on account of his own salary and office expenses. Most of these he probably took from some other account; some of them probably from this one; but we cannot go further than to accept the witness' figures and take the net figure of $2,000 as the amount by which the official withdrawals did not equal the official depos-

its, and which was therefore diverted somewhere else. We see no theory upon which it can fairly be found that this $2,000 was paid to the bank. First we meet the undisputed statement of Whitice that, whatever withdrawals he may have made out of this bank in addition to transfers, salary, etc., were for use in paying for his home, and that this home, standing for all the public money which he had put into it, was turned over to these sureties, so that they have already had the benefit of it. We notice also that the $2,000 deficiency could be allocated as well to any of the other personal disbursements of Whitice as to the payments to the bank. Clearly there can be no intelligent consideration of these note payments as a whole, but each transaction must stand by itself.

■ In each of several cases he borrowed $2,500 or $3,000, deposited it in this account, and within from fifteen to thirty days thereafter drew a check against this account and thereby paid the note. The period from May 10 is typical. On May 10, the account balance was $13,052. There is entire uncertainty as to whether any of it, or how much of it, was official. He deposited the proceeds of the $2,500 loan. That was personal and made the balance $15,545. Before June 10 the balance fluctuated between $16,825 and $116. No analysis is made of the deposits or checks. June 10 the balance was $8,705, and from it he paid the note. Except by substituting an arbitrary presumption for intelligent inference, we cannot say that official funds were used in this payment. Such presumption we cannot accept. Maryland Co. v. City Bank, supra.

■ The other notes were paid to the bank by Whitice in a different way. His main depository of public funds was the Hamilton National Bank. Here he carried three accounts, one in form as of the county court clerk, one in his personal name, which he used for payment of salaries and office expenses, and one intended for his official fees, belonging to him personally. Two notes to the Highland bank, one of $2,500 and one of $2,000, he paid at maturity with his checks upon the Hamilton National Bank, drawn upon the printed form showing that the account was that of "W. A. Whitice, County Court Clerk;" and signed with his name and his designation "C. C. C." Here was an apparent payment of his personal debt to the Highland bank with his official funds on deposit in another bank, and not only was the form of the checks notice of their character, but the Highland manager admits his under-

standing to the same general effect. If in fact these two checks did deplete his official funds in the Hamilton and the depletion was not made good, then, under our decisions in Fidelity Co. v. Union Bank, 228 F. 448, and the Maryland Case, supra, we see no reason why the Highland must not refund these amounts; and the priority of the state seems sufficient to include the whole of them.

There are two decisions which perhaps give color to the contrary view. In Havana R. R. v. Knickerbocker Trust Co., 198 N. Y. 422, 92 N. E. 12, L. R. A. 1915B, 720, and Allen v. Puritan Trust Co., 211 Mass. 409, 97 N. E. 916, L. R. A. 1915C, 518, the bank which had accepted the trustee's or agent's check was not held liable, and this was on the theory that the payment of such check by the drawee bank was a representation by the authorized agent of the beneficiary or principal, that the check was properly drawn. This theory has been disapproved by the Second Circuit Court of Appeals (Havana R. R. v. Central Trust Co., 204 F. 546, L. R. A. 1915B, 715), and later doubted in New York (Whiting v. Hudson Trust Co., 234 N. Y. 394, 138 N. E. 33, 25 A. L. R. 1470). We are not satisfied to apply it here. The Hamilton bank honored these checks in due course, but it did not know that Whitice had used them to pay his own debt; and, in the absence of any notice to the Hamilton of this misuse, the Highland cannot rely upon such payment, if indeed it could otherwise do so.

As the proof stands, it justifies the inference that this depletion did, in fact, occur. Whitice says, though rather casually, that these checks were paid from his official funds in the Hamilton. He explains his handling of the bank accounts to be such that he would have no personal rights to funds in the Hamilton, unless temporarily, pending his transfer to another bank, not the Highland, of his commissions and fees. All parties acquiesce in treating his transfers from the Highland to the Hamilton as covering only official funds. As to fixing liability upon the Highland for these two note payments, we hesitate only because its counsel insist that these two payments were not in issue under the pleadings, and hence the Highland was not bound to meet this proof. There was, at least, general basis enough in the bill upon the subject so that the court would doubtless have permitted an amendment making the specific charge, if attention had been called thereto; but, in view of the state of the record, and counsel's insistence, we are not satisfied to foreclose the question. The High-

land may have further opportunity, under the direction of the court below, to put in proofs relative to this depletion; and that issue may be further heard and decided, as the court below may think proper. As to the $2,000 general balance, and the notes paid from the Highland account, there was no excuse for not developing the proofs as fully as either party desired, and those issues should not be reopened.

■■ In the latter part of December, 1924, Whitice borrowed $2,500 from the bank, and deposited it in this account. Four days later he drew a check for $3,000, which was used in payment for an interest in some Florida property. It is clear that this deposit went to pay this check. The remaining $500 is said to have been made up partly of cash furnished by his son and put into this account, and partly of an existing indebtedness from the father to the son. The interest in the property was taken in the name of the son. The father claims that the $2,500 was a loan from him to the son. Within a short time the Florida property was sold, and there was apportioned to this Whitice share $3,600 in cash and about $5,000 of notes. By this time, the conflicting claims had arisen; and by common agreement the money and the notes were paid to Williams, who agreed to hold them as trustee for the benefit of the rightful claimants. By the original bill of complaint, the surety companies claimed this fund, or $3,000 of it, or at least $2,500. These claims were on the theory that the state had a lien upon all of Whitice's assets during his insolvency, and therefore a lien upon this $2,500, or $3,000, and, on the further theory, that the money furnished from this account was public money, charged with a trust in favor of the state. The first theory we have declined to accept; the second theory is not established in fact. After the decision of the court to this effect had been announced, awarding this fund to Whitice, Jr., and denying the surety companies any relief in that respect, they for the first time, and by a "motion for additional findings," presented the theory that the $2,500 debt from the son to the father was an equitable asset of the father, to the payment of which the $2,500 in Williams' hands was devoted, so that this $2,500, belonging to Whitice, Sr., was practically before the court for distribution; and, by virtue of the state's priority, the surety companies were entitled to have it. This was a proposal to proceed, in effect, as if by creditors' bill against equitable assets, and, by a short cut, to avoid the necessity of

a judgment and execution returned unsatisfied. There is no occasion to deny that under circumstances like these a court of equity might sanction such a short cut, and award this fund to the state, or its subrogee; but appropriate allegations and prayers for relief should have been contained in the bill of complaint. Amendment of the bill was permitted on the trial, as far as plaintiffs desired; but, when this belated application was made to permit plaintiffs to recover on a new ground, granting it was discretionary, and the court denied it. It involved so much of irregularity in practice and was so out of time, that we cannot say the court was in error in this denial.

Hence the decree, as to this Whitice-Williams fund, should be affirmed; as to the Highland Bank, it should be reformed in accordance with this opinion; in all other respects affirmed. Costs of this court should be awarded to the surety companies as against the Highland bank and to Williams, trustee, as against the surety companies.