**UNITED STATES of America, Plaintiff,**

v.

**NBD BANK, N.A., Defendant.**

**Civil Action No. 95–40343.**

United States District Court,
E.D. Michigan,
Southern Division.

April 4, 1996.

Mitchell J. Matorin, Tracy J. Whitaker, J. Christopher Kohn, Department of Justice, Civil Division, Washington, DC, for U.S.

Judy B. Calton, Honigman, Miller, Schwartz & Cohn, Detroit, MI, for NBD Bank N.A.

*MEMORANDUM AND ORDER GRANT-
ING IN PART AND DENYING IN
PART PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT AND DENY-
ING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT*

GADOLA, District Judge.

This is a complex case in which the Government is trying to recover funds from NBD that were improperly diverted from a federally-backed mortgage program and then allegedly given to NBD in repayment of a loan. The Government has three claims: (1) constructive trust, (2) conversion, and (3) breach of contract. Both parties have moved for summary judgment on all three claims. A hearing was held in this matter on February 14, 1996. For the following reasons, this court will deny defendant's motion for summary judgment and partially grant plaintiff's motion for summary judgment.

## I. Factual Background

### A. The Federal Mortgage–Backed Securities Program

The federal government operates a mortgage-backed securities program, pursuant to 12 U.S.C. § 1721(g), under which it authorizes "issuers," who are private lenders, to issue securities backed by mortgages. The securities are guaranteed by the Government National Mortgage Association (hereinafter "GNMA"). Fidelity Guarantee Mortgage Corp. (hereinafter "Fidelity") was an issuer under this program.

Under the standard Guaranty Agreement between an issuer and GNMA, the issuer assigns to GNMA all equitable title in the mortgages it holds. The issuer retains only a bare legal title so that it may service these mortgages. The issuer collects the mortgage payments (which include payments for principle, interest, insurance, and taxes) and places them in various custodial accounts. Separate custodial accounts exist for principle and interest payments and insurance and tax payments. The issuer pays the money allocated to the principle and interest account to the investors who purchased securities from the issuer. The issuer pays the money in the tax and insurance account to various insurance companies and taxing agencies.

Since the securities are backed by the government, if the issuer cannot pay the proper amount of money to the investors, the government will pay any shortage of money. Thus, the investors are guaranteed a certain return on their investment.

Upon the default of the issuer, the GNMA takes the legal title to the mortgages (all equitable title to the mortgages already belongs to GNMA) and begins to service the mortgages itself. Further, all money held in the custodial accounts by the issuer goes to GNMA for proper disbursement. Insolvency or pending insolvency is a default under the standard Guaranty Agreement.

### B. The Case At Bar

On November 12, 1980, GNMA approved Fidelity as an issuer in its mortgage-backed securities program. Fidelity serviced mortgages under this program until October 13, 1992. As part of this program, Fidelity established custodial accounts at NBD. One of the custodial accounts was for tax and insurance payments collected by Fidelity. This account ("the T & I account") was numbered 10973–03, and was the account from which funds were allegedly misdirected. Under §§ 4.13 & 7.03 of the Guaranty Agreement between GNMA and Fidelity, T & I funds could only be withdrawn for payments of taxes and insurance on the mortgages being serviced. Further, there was a letter agreement between NBD and Fidelity concerning the T & I account. This letter agreement provided: "In no instance shall the funds in the Escrow Custodial Account be used to offset funds which may have been advanced to, or on behalf of, the issuer by the custodian institution." This letter agreement and the signature cards for the T & I account authorized Mr. Jacobs (hereinafter "Jacobs"), Fidelity's president, to withdraw funds from the account.

In addition to the custodial accounts, Fidelity also had its corporate accounts at NBD. One of these accounts, acct. no. 11795–63, was the "operating account" for Fidelity. It was into this operating account that the funds from the T & I account were allegedly misdirected.

NBD had made significant loans to Fidelity. On November 15, 1990, NBD extended Fidelity a $4,500,000 line of credit. On August 12, 1991, this was reduced to $4,000,000 due to Fidelity's default on the first loan. NBD received security interests in Fidelity's bank accounts and various mortgages owned by Fidelity as collateral for these loans. Throughout 1991 and 1992, Fidelity's indebtedness to NBD ranged from approximately 2.7 to 4 million dollars. As Fidelity received income from the sale of mortgages, it would repay NBD the money it had borrowed for those mortgages and NBD would release the liens that it had on those mortgages and decrease the balance of Fidelity's indebtedness.

On September 28, 1992, Jacobs withdrew $225,000 from the T & I account by way of check made payable to Fidelity (*not* made payable to either an insurance company or a taxing agency). Jacobs then deposited this check in Fidelity's operating account at NBD. The $225,000 was mingled with other funds belonging to Fidelity. The operating account balance remained above $225,000 until October 9, 1992 when it fell to $64,033.52. On October 9, Fidelity paid $566,209.49 to NBD and $539,549.24 to various other entities from its operating account. It is not clear from the record if the money paid to NBD from the operating account was withdrawn before or after these other withdrawals on October 9, 1992. Between October 9, 1992 and October 13, 1992, the operating account balance rose to $73,876. The next debit to the operating account occurred on October 13, 1993, when the entire balance of the account was paid to NBD.

On October 13, 1992 Fidelity filed for bankruptcy under Chapter 11. On October 27, 1992, the bankruptcy was converted to a Chapter 7 bankruptcy. On October 5, 1994, the bankruptcy trustee sued NBD for, among other things, the $225,000 taken from the T & I account. This claim was settled, with the parties agreeing that these funds were not property of the estate. On November 8, 1994, GNMA sued the trustee for the $225,000 at issue here. On April 27, 1995, Jacobs was convicted of fraud. On July 20, 1995, GNMA moved to add NBD as a party

to the bankruptcy proceeding. This motion was denied on August 14, 1995. Thus, on September 18, 1995, GNMA filed the present action against NBD to recover the T & I funds, asserting claims for constructive trust, conversion, and breach of contract. NBD and GNMA both move for summary judgment on all three claims.

## II. Standard of Review

■ Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "A fact is 'material' and precludes grant of summary judgment if proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect [the] application of appropriate principle[s] of law to the rights and obligations of the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir.1984) (citation omitted). The court must view the evidence in a light most favorable to the nonmovant as well as draw all reasonable inferences in the nonmovant's favor. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Bender v. Southland Corp.*, 749 F.2d 1205, 1210–11 (6th Cir.1984).

■ The movant bears the burden of demonstrating the absence of all genuine issues of material fact. *See Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 861 (6th Cir.1986). This burden "may be discharged by 'showing'—that is, pointing out, to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Once the moving party discharges that burden, the burden shifts to the nonmoving party to set forth specific facts showing a genuine triable issue. Fed.R.Civ.P. 56(e); *Gregg*, 801 F.2d at 861.

■ To create a genuine issue of material fact, however, the nonmovant must do

more than present some evidence on a disputed issue. As the United States Supreme Court stated in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986),

> There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmovant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

(Citations omitted). *See Catrett*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). The evidence itself need not be the sort admissible at trial. *Ashbrook v. Block*, 917 F.2d 918, 921 (6th Cir.1990). However, the evidence must be more than the nonmovant's own pleadings and affidavits. *Id.*

### III. Analysis

#### A. Constructive Trust

■ Constructive trusts "may be imposed when property 'has been obtained through fraud, misrepresentation, concealment, undue influence, . . . or any other similar circumstances which render it unconscionable for the holder of the legal title to retain and enjoy the property.'" *Kammer Asphalt Paving Co., Inc. v. East China Township Sch.*, 443 Mich. 176, 188, 504 N.W.2d 635 (1993) (citations omitted). *See* Restatement of Restitution § 160 (1936); V William F. Fratcher, Scott on Trusts § 462, at 304–06 (4th Ed.1989). A constructive trust is a legal fiction designed to prevent unjust enrichment. *Kammer*, 443 Mich. at 188, 504 N.W.2d 635. Funds that are subject to a constructive trust may not be recovered from a third party if (1) the funds cannot be traced to the third party or (2) the third party is a bona fide purchaser of the property, i.e., a purchaser for value and without notice of the misconduct that justified imposition of the constructive trust. *See* 76 Am.Jur.2d *Trusts* §§ 292–97, 311–20 (1992).

■ GNMA argues that the T & I funds are subject to a constructive trust because (1)

Jacobs removed funds from the T & I account and deposited them in Fidelity's operating account; (2) the funds in the operating account were spent by Fidelity for its own purposes; and (3) under the Guaranty Agreement between GNMA and Fidelity, Fidelity did not have any equitable title in those funds—equitable title had been assigned to GNMA. The record before the court conclusively supports these three premises. GNMA further argues that it can trace the wrongly diverted funds from the T & I account to NBD.

NBD argues that there can be no constructive trust, as a matter of law, because (1) under a Sixth Circuit case entitled *In re Omegas*, 16 F.3d 1443 (6th Cir.1994), a constructive trust may not be used to recover assets from a bankruptcy proceeding; (2) the funds cannot be traced from the T & I account to NBD; (3) NBD is a bona fide purchaser of the funds and therefore has a greater equitable interest than GNMA in the funds; and (4) GNMA's claims are barred because GNMA did not timely file a claim pursuant to M.C.L. § 440.4406(1). These arguments will be addressed in turn.

#### 1. *In re Omegas Group, Inc.*

NBD first argues that a constructive trust may not be imposed because to do so would impermissibly take funds out of a bankruptcy estate. NBD relies on *In re Omegas*, 16 F.3d 1443 (6th Cir.1994). GNMA counters that the T & I funds never were a part of Fidelity's bankruptcy estate because equitable title to these funds never belonged to Fidelity. Therefore, according to GNMA, *Omegas* does not apply.

In *Omegas*, the Omegas Group went bankrupt. Just prior to bankruptcy, the Omegas Group received over $1,000,000 from a company called Datacomp, for the purchase of computers. The computers were never delivered. Datacomp claimed that it had been defrauded and that the funds it paid to Omegas were in a constructive trust for it and were not part of the bankruptcy estate.

The Sixth Circuit disagreed, holding that the funds were a part of the bankruptcy estate:

Because a constructive trust, unlike an express trust, is a remedy, it does not exist until a plaintiff obtains a judicial decision finding him to be entitled to a judgment "impressing" defendant's property or assets with a constructive trust. Therefore, a creditor's claim of entitlement to a constructive trust is not an "equitable interest" in the debtor's estate existing prepetition, excluded from the estate under § 541(d).

We do not address here property already impressed with a constructive trust by a court in a separate proceeding prepetition.... Nor do we address property that a state by statute has declared to be held in trust for particular purposes....

*Id.* at 1451.

The rationale behind this holding was that "each unsecured creditor desires to have his particular claim elevated above the others. Imposition of a constructive trust clearly thwarts the policy of ratable distribution...." *Id.* The court further supported its decision by noting that "[c]onstructive trusts are anathema to the equities of bankruptcy since they take from the estate, and thus directly from competing creditors, not from the offending debtor." *Id.* at 1452.

The present case can be distinguished from *Omegas.* To begin with, this is not a bankruptcy case. The funds being sought in this case are in the hands of NBD, not Fidelity's bankruptcy estate. The funds were transferred before the bankruptcy proceedings. Therefore, at the commencement of the bankruptcy proceedings, they were not assets of Fidelity. Thus, the rationale of the rule in *Omegas* clearly does not apply. If this court imposes a constructive trust over these funds, ratable distribution of the bankruptcy estate will *not* be affected because the funds are not being taken from the estate.

NBD itself argued that the funds were not a part of the estate when GNMA sought to join NBD to the bankruptcy action. In a letter to GNMA, NBD stated: "[A]dding NBD as a defendant to the [bankruptcy] proceeding would vexatiously multiply proceedings because the Bankruptcy Court ...

does not have subject matter jurisdiction over what is essentially a dispute between two creditors of the debtor *that arose prepetition independently of the bankruptcy case.*" Also, as part of the settlement agreement between NBD and the bankruptcy trustee, NBD agreed that the funds were not in the estate. Thus, it seems that NBD has hoisted itself on its own petard and is in a poor position to argue that *Omegas,* a bankruptcy case about funds within a bankruptcy estate, applies to the present action.

*Omegas* can also be distinguished from the present case because, unlike Datacomp in *Omegas,* GNMA contractually had equitable title to the funds prepetition, regardless of whether a constructive trust was later imposed by a court. Fidelity created an express trust when it entered the mortgage-backed securities program. Fidelity assigned equitable title to the funds in the T & I account to GNMA before it went bankrupt. Thus, *Omegas* does not apply because *Omegas* is expressly limited to cases in which the plaintiff has no equitable interest in the funds, other than an allegation of a constructive trust, prior to the initiation of bankruptcy proceedings.

Accordingly, a constructive trust may be imposed here, if otherwise warranted. *Omegas* does not preclude the imposition of a constructive trust in the present case.[1]

### 2. Tracing the Funds

GNMA contends that the T & I funds are easily traced into NBD's hands under the intermediate balance rule. The intermediate balance rule is founded on two key principles. First, when a trustee commingles trust funds and personal funds, any funds removed from the commingled account are presumed to be personal funds. In other words, funds held in trust will remain in a commingled account for as long as possible. *National Bank v. Insurance Co.,* 104 U.S. 54, 26 L.Ed. 693 (1881). Second, "where one has deposited trust funds in his individual bank account, and the mingled fund is at any time depleted, the trust fund is thereby dissipated,

1. Various other arguments are raised by GNMA as to why *Omegas* should not apply. In light of the above discussion, these arguments need not be addressed.

and cannot be treated as reappearing in sums subsequently deposited to the credit of the same account." *Schuyler v. Littlefield,* 232 U.S. 707, 34 S.Ct. 466, 58 L.Ed. 806 (1914). In other words, funds deposited into a commingled account are not generally treated as trust funds.[2] Combining these two principles leads to the conclusion that the beneficiary of a constructive trust may not retrieve more from a commingled account than the lowest balance of the account recorded at any time after the trust funds have been mingled.[3]

The Fidelity operating account's balance went to zero on October 13, 1992, after the T & I funds had been placed there. GNMA argues that Fidelity's payments to NBD on October 9 and 13 caused the balance in the operating account to become zero. Thus, GNMA argues that under the intermediate balance rule, the payments on October 9, 1992 and October 13, 1992 are presumed to include the funds wrongly taken from the T & I account.

■■■ NBD argues that funds can never be traced to third parties from a commingled account. In other words, NBD argues that once the balance of Fidelity's operating account became zero, after the T & I money had been placed there, the T & I funds were lost forever and cannot be traced. The intermediate balance rule does not require this, however. The intermediate balance rule only states that once the commingled account balance becomes zero, the trustee cannot recover funds *that are later deposited in that account.* It says nothing about tracing funds out of a commingled account to third parties.

*See* 76 Am.Jur.2d *Trusts* § 307 (1992) ("[I]f the entire commingled fund or account is completely withdrawn, the trust funds are dissipated and lost *unless they can be further traced and identified."*).

■■■ In the present case, some of the misdirected $225,000 can be conclusively traced to NBD. When the T & I funds were placed in the operating account, they were assumed to stay in that account as long as possible. Thus, the T & I funds were the last funds to be removed from the operating account immediately before the account balance went to zero on October 13, 1992. On October 9, 1992, the account balance fell to $64,033.52. This $64,033.52 is presumed to be T & I money. The next debit to that account was $73,876,[4] paid to NBD, which emptied the operating account. Thus, the $64,033.52 that is presumed to be T & I funds in the operating account on October 9, 1992 was paid to NBD on October 13, 1992. GNMA has successfully traced this $64,-033.52 in misdirected T & I funds to NBD.

■■■ The above discussion does not resolve GNMA's claim for the remainder of the misdirected T & I money, $160,966.48.[5] On October 9, 1992, $160,966.48 of the T & I money was removed from the operating account. When the balance fell below $225,000 on October 9 to $64,033.52, the last $160,-966.48 to leave the account on that day is presumed to be from the T & I account. Even though $566,209.49 was paid to NBD on October 9, 1992, the record does not disclose when during the day that money was paid to NBD.[6] On October 9, 1992, $539,-

---

**2.** A possible exception to this principle may occur when subsequent deposits are intended to replace depleted trust funds. *See* 76 Am.Jur.2d *Trusts* § 307 (1992). This exception does not apply to the present case, however.

**3.** An example helps to illustrate this: Assume a fiduciary commingles $5,000 of trust money with $5,000 of personal money in his personal account. $5,000 is then withdrawn from the account. The $5,000 remaining in the account is presumed to be the trust money.

Assume an additional $2,500 is withdrawn. Assume that later, $2,500 is placed in the account, bringing the balance back up to $5,000. Now, only $2,500 of the $5,000 in the account is presumed to be trust funds. The trustee cannot recover more than $2,500 from the commingled

account because $2,500 is the lowest balance of the commingled account recorded after the mingling of the funds.

**4.** A small amount of money was deposited into Fidelity's operating account in between October 9 and October 13. Under the intermediate balance rule, this money is not presumed to be T & I money.

**5.** $225,000 − $64,033.52 = $160,966.48.

**6.** GNMA argues that since the payments to NBD are listed last on the records provided to the court, those payments must have been the last payments of the day. The payments, however, are arranged by the amount of the payment. The

549.24 was paid out of the operating account to entities other than NBD. There is no way of knowing, based on the current record, whether the last $160,966.48 to leave the operating account on October 9, 1992 went to NBD or someone else. Therefore, GNMA has not yet traced any of that $160,966.48 to NBD.

### 3. NBD's Equitable Right to the Funds

■ Even though a portion of the T & I funds have been traced to NBD from the operating account, those funds may only be recovered under a theory of constructive trust if NBD has not acquired greater equitable right to the funds, i.e., if NBD is not a bona fide purchaser for value and without notice (hereinafter "BFP").

NBD argues that it is a BFP because it released collateral based upon the receipt of these loan payments by Fidelity. NBD also asserts that it had no notice that the funds used to pay it were from the T & I account.

GNMA argues that NBD knowingly took the risk that the funds it accepted were trust funds because it knew: (1) that the T & I account was a custodial account; (2) that Jacobs wrote a check on the T & I account, made out to Fidelity, and deposited it in Fidelity's operating account at NBD; (3) that the relevant loan repayments came from that operating account. Accordingly, GNMA argues that NBD could not possibly have acquired a greater equitable right to the T & I funds in its possession.

■ This court agrees with GNMA's reasoning. NBD knew that the T & I account held money in trust. Further, NBD knew that money had been transferred from the T & I account to Fidelity's operating account. While that, standing alone, may not have been enough to impose liability on NBD,[7] NBD is not held liable because it allowed T & I funds to be deposited in the operating account. Nor is NBD held liable because it allowed money to be paid from the operating account to others. NBD is liable because it *accepted* funds from the operating account after T & I funds had been placed in that account. This court holds that when NBD accepted funds from the operating account in satisfaction of Fidelity's debt to NBD, NBD took the risk that those funds were actually misdirected trust funds from the T & I account. NBD cannot now assert an equitable right to those funds paramount to that of the beneficiary of the constructive trust created by the misdirection of the funds. In short, NBD must return the trust money traced to it.

The weight of authority holds that "where a deposit of fiduciary funds is made in the fiduciary's personal account, and he subsequently pays a personal debt to the bank by a check drawn on that account," the bank is liable "to the extent that the trust funds so deposited in the trustee's personal account are used in paying the depositor's debt to the bank." IV Fratcher, Scott on Trusts § 324.4 at 269.

> [W]here the bank takes, in payment of a depositor's personal debt, a check against his personal account, ... knowing that trust funds have been mingled with personal funds in that account, ... [the] bank must make good to the trust, to the extent that payment of the depositor's debt in fact depletes trust funds in the account. While it has no knowledge that it is receiving trust funds, it does know of the presence of trust funds in the account, and this factor is deemed enough to bar it from deriving a direct advantage through what is shown later to have been a diversion of trust funds. *It has no equity equal to that of the real owner.*

*Aetna Casualty & Surety Co. v. Catskill Nat'l Bank & Trust Co.,* 102 F.2d 527, 530 (2d Cir.1939) (emphasis added). *See also, Fidelity & Deposit Co. of Maryland v. Highland Trust & Savings Bank,* 44 F.2d 697, 698 (6th Cir.1930) (holding that bank is put on

---

7. payments to NBD are last on the list because they are the largest payments to any one entity for that day. Accordingly, this court may not assume that the payment to NBD was the last payment drawn on the commingled account on October 9, 1992.

7. *See Columbia Land Co. v. Empson,* 305 Mich. 220, 228, 9 N.W.2d 452 (1943); *Portage Aluminum Co. v. Kentwood Nat'l Bank,* 106 Mich.App. 290, 295–97, 307 N.W.2d 761 (1981).

inquiry notice to ascertain whether it is receiving trust funds when it accepts repayment of a loan from a commingled account; if bank received trust funds, it must return funds because it has no equity in funds equal to that of the trust beneficiary); *Maryland Casualty Co. v. City Nat'l Bank,* 29 F.2d 662, 664 (6th Cir.1928) (same holding); *United States Fidelity & Guaranty Co. v. Union Bank & Trust Co.,* 228 F. 448, 451 (6th Cir.1915) (same holding); IV Fratcher, Scott on Trusts § 324.4, at 269 n. 5.

Further support for this holding is found in *Blair v. Trafco Products, Inc.,* 142 Mich. App. 349, 369 N.W.2d 900 (1985). In *Trafco,* a bank had effected a setoff against a commingled account in order to recover funds owed by the trustee to the bank. The court, in conformity with *Portage Aluminum Co. v. Kentwood Nat'l Bank,* 106 Mich.App. 290, 307 N.W.2d 761 (1981), held that the bank was under no obligation, prior to effecting the setoff, to inquire as to whether the trustee was breaching his duty. In other words, the mere fact that the trustee had transferred trust funds into his personal account was not enough, standing alone, for the bank to infer that the trustee had violated his fiduciary duty. Nonetheless, the court held that the bank must return the funds to the trust beneficiary because the money did not belong to the trustee, but rather to the trust beneficiary. *Id.* at 355, 307 N.W.2d 761. As between the bank and the trust beneficiary, the trust beneficiary had greater rights to the trust money.

Similarly, any money traced from the T & I account to NBD does not belong to NBD, but rather to GNMA, the trust beneficiary. Merely by accepting the T & I funds in repayment of a loan and releasing the collateral for the loan, NBD did not attain a right to the T & I funds greater than that of the trust beneficiary. This is true even if one assumes that NBD was unaware that it actually received T & I funds.

**4. Application of M.C.L. § 440.4406**

NBD argues that GNMA may not successfully assert any of its claims against NBD because it did not comply with the notice requirement of M.C.L. § 440.4406. M.C.L. § 440.4406 provides, in pertinent part:

> (6) Without regard to care or lack of care of either the customer or the bank, a customer who does not within 1 year after the [bank] statement or items are made available to the customer . . . discover and report his or her unauthorized signature on or any alteration on the item is precluded from asserting against the bank the unauthorized signature or alteration.

▇ This is not a statute of limitations, but rather a notice requirement that must be met before bringing a claim against a bank. *Siecinski v. First State Bank,* 209 Mich.App. 459, 464, 531 N.W.2d 768 (1995). It is undisputed that GNMA did not notify NBD of the unauthorized transfer of funds from the T & I account to Fidelity's operating account within one year of the transfer.

▇ Assuming this statute applies to the case at bar,[8] it is preempted by GNMA's enabling statute, 12 U.S.C. § 1721(g), which provides, in part:

> [W]ith respect to any issue of guaranteed securities, in the event of default [of the issuer] and pursuant otherwise to the terms of the contract, the mortgages that constitute such trust or pool [of mortgages against which the guaranteed securities are issued] shall become the absolute property of the Association subject only to the unsatisfied rights of the holders of the securities based on and backed by such trust or pool. *No state . . . law . . . shall preclude or limit the exercise by the Association of . . . its ownership rights . . . in the mortgages . . . .*

There is federal preemption when a federal law expressly preempts state law. *Hillsborough County v. Automated Medical Lab, Inc.,* 471 U.S. 707, 712–13, 105 S.Ct. 2371, 2374–75, 85 L.Ed.2d 714 (1985). 12 U.S.C.

---

**8.** It is possible that the statute does not apply to situations in which a trust beneficiary is bringing suit against a bank to recover trust funds improperly paid to the bank by the trustee/deposi-tor. This court need not address that issue because the statute, if applicable, would be preempted.

§ 1721(g) expressly preempts state law that limits the exercise by GNMA of its ownership rights in mortgages that it controls because of a default of the issuer. First, this court must determine whether GNMA's ownership rights in the mortgages include the right to collect funds paid by mortgagors for the payment of taxes and insurance on the mortgages. Second, this court must determine whether M.C.L. § 440.4406 limits these ownership rights.

NBD first argues that GNMA does not have ownership rights to those portions of the mortgage payments earmarked for the payment of taxes and interest. NBD cites no case law or legislative history in support of this argument. The language of the statute itself makes no such distinction. The statute simply preempts state law limiting GNMA's "ownership rights ... in the mortgages." 12 U.S.C. § 1721(g). Accordingly, the statute is of little help in defining the scope of GNMA's ownership rights in the mortgages.

The statute does refer to the Guaranty Agreement, however. 12 U.S.C. § 1721(g) provides that the mortgages become the absolute property of GNMA "pursuant ... to the terms of the contract." The relevant portions of the Code of Federal Regulations also provide that the transactions relating to the issue and guaranty of these mortgage-backed securities are governed by the Guaranty Agreement between the parties. *See, e.g.,* 24 C.F.R. § 390.1 (1989). Thus, the Guaranty Agreement defines the scope of GNMA's ownership rights in the mortgages.

Section 3.01 of the standard Guaranty Agreement between Fidelity and GNMA mandates that Fidelity transfer to GNMA the "right, title, and interest of [Fidelity] in and to the mortgages...." This right is defined to include "all interest, principal, *and other payments made on or with respect to such mortgages* on and after the effective date of this agreement." When Fidelity defaulted, GNMA, pursuant to 12 U.S.C. § 1721(g), took legal title[9] to the mortgages from Fidelity and became responsible for servicing those mortgages. The Guaranty Agreement clearly provides that GNMA's

ownership rights in the mortgages, at that time, included the right and responsibility to collect and distribute mortgage payments earmarked for the payment of taxes and insurance. Further, GNMA had the right to all such funds that Fidelity had collected. Therefore, the most reasonable interpretation of 12 U.S.C. § 1721(g), in light of the federal regulations and the Guaranty Agreement, is that GNMA's ownership rights in the mortgages extend to all mortgage payments, including payments earmarked for taxes and insurance. Accordingly, this court holds that GNMA's "ownership rights" in the mortgages, as used in 12 U.S.C. § 1721(g), include the right to collect those portions of the mortgage payments earmarked for taxes and insurance.

Additionally, NBD notes that GNMA's ownership rights, protected by federal preemption under 12 U.S.C. § 1721(g), did not exist at the time that Fidelity, through Jacobs, removed the funds at issue from the T & I account. From that premise, NBD concludes that federal preemption does not apply to GNMA's attempts to recover these funds. Not surprisingly, NBD again cites no case law in support of its argument.

It is true that GNMA's ownership rights under 12 U.S.C. § 1721(g) did not arise until Fidelity defaulted, which was after the T & I funds were misdirected. Nonetheless, once the default did occur, GNMA gained all ownership rights in the mortgages. GNMA presently has those ownership rights which, as discussed previously, include the right to all mortgage payments collected by Fidelity after the date of the Guaranty Agreement. The T & I funds at issue are mortgage payments collected by Fidelity after the date of the Guaranty Agreement. Therefore, GNMA may now assert the preemption provision of § 1721(g) to protect its present ownership rights in the T & I funds. It does not matter that those funds were misdirected before Fidelity's default occurred.

Having held that GNMA currently has ownership rights to the misdirected T & I funds, this court now must determine if M.C.L. § 440.4406 would impermissibly limit

9. Under the Guaranty Agreement, GNMA already had equitable title to the mortgages.

the assertion of those rights. Assuming that it applies to the present situation, M.C.L. § 440.4406 clearly would limit the assertion by GNMA of its ownership rights to the misdirected T & I funds. According to NBD, it would totally bar the assertion of those rights by GNMA. Therefore, to the extent that it applies to this action, M.C.L. § 440.4406 is preempted by 12 U.S.C. § 1721(g) and the Supremacy Clause of the Constitution. M.C.L. § 440.4406 may not bar GNMA's present claims.

## 5. Conclusion

GNMA has proven that Fidelity, through Jacobs, misdirected T & I funds and that those funds are properly subject to a constructive trust for which GNMA is the beneficiary. GNMA can only trace $64,033.52 of the misdirected funds to NBD, however. There is a material question of fact concerning whether NBD is in possession of the rest of the funds. Therefore, GNMA is entitled to judgment as a matter of law with respect to $64,033.52 of the misdirected funds.

## B. Conversion

■■■ GNMA also asserts a claim against NBD for conversion, based upon NBD's possession of T & I funds. "Conversion is any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein." *Thoma v. Tracy Motor Sales, Inc.*, 360 Mich. 434, 438, 104 N.W.2d 360 (1960) (citation omitted). Generally, good faith is not a defense to conversion; it can be committed unwittingly. *Citizens Ins. Co. of America v. Delcamp Truck Center, Inc.*, 178 Mich.App. 570, 444 N.W.2d 210 (1989).

■■■ NBD argues that under the UCC, it may not be liable for conversion, as a matter of law, because it acted in a commercially reasonable manner. NBD relies on the version of M.C.L. § 440.3419 applicable to this case, which provides in part:

> (3) Subject to the provisions of this act concerning restrictive indorsements a representative, including a depositary or collecting bank, who has in good faith and in accordance with the reasonable commercial standards applicable to the business of such representative dealt with an instrument or its proceeds on behalf of one who was not the true owner is not liable in conversion or otherwise to the true owner *beyond the amount of any proceeds remaining in his hands.*

M.C.L. § 440.3419 (1964) (emphasis added). Even if this provision applied to NBD, it does not bar recovery of trust funds that are in NBD's possession. Those are the only funds that GNMA is attempting to retrieve. GNMA's conversion claim is based upon NBD's possession of the T & I funds, not the fact that it processed checks that diverted the T & I funds to other sources. Accordingly, M.C.L. § 440.3419 provides no shield for NBD.

NBD also asserts that it is not liable for conversion because it has since acquired superior equities in the funds. This issue was addressed previously in this opinion. This court holds that NBD, under the circumstances of this case, did not, as a matter of law, obtain equities superior to those of GNMA in the T & I funds.[10]

■■■ Lastly, NBD argues that it is not liable because there can be no conversion for money or other fungible items. This argument also fails. The law is clear that an "action will lie for the conversion [of money],

---

**10.** On this point NBD relies on *In re Williams Bros. Asphalt Paving Co.*, 59 B.R. 71 (1986). In *Williams*, the bankruptcy judge held that a bank who unknowingly received trust funds from a trustee in repayment of the trustee's loans could keep those funds, in spite of their status as trust funds. The court held that the bank could not be charged with knowledge of the status of the funds and had acquired greater equity in the funds.

In *Williams*, however, there was never an express trust fund account at the defendant bank from which the funds at issue were transferred. *Williams* would apply to this case if NBD had no knowledge that the T & I account contained trust funds. However, NBD was aware that the T & I account contained trust funds, was aware that those funds had been transferred to Fidelity's operating account, and was aware that it received repayment of its loans from Fidelity's operating account. Under those circumstances, NBD must return the funds. *See, e.g., Fidelity & Deposit Co. of Maryland v. Highland Trust & Savings Bank*, 44 F.2d 697, 698 (6th Cir.1930).

where there is an obligation to keep intact or deliver the specific money in question, and where such money can be identified." *Garras v. Bekiares,* 315 Mich. 141, 149, 23 N.W.2d 239 (1946). There was an obligation to keep the T & I funds intact, i.e., separate from other funds. Further, as discussed above, GNMA can trace $64,033.52 of the T & I money into NBD's hands. The general rule that money cannot be converted does not bar GNMA's conversion claim under the circumstances of this case. The T & I funds were subject to conversion.

GNMA has proven, as a matter of law, that NBD is in possession of $64,033.52 from the T & I account. Further, GNMA has shown that it has greater equitable title to that money. Accordingly, GNMA is entitled to summary judgment on its conversion claim in the amount of $64,033.52.

## C. Breach of Contract

■ GNMA's breach of contract claim is based on the Letter Agreement between NBD and Fidelity, of which GNMA is a third party beneficiary.[11] The Letter Agreement provides, in part:

> In no instance shall the funds in the Escrow Custodial Account be used to offset funds which may have been advanced to, or on behalf of, the issuer by the custodian institution.

GNMA asserts that this contract was breached when NBD allowed Fidelity to repay Fidelity's indebtedness to NBD with funds that can be traced back to the T & I account. The funds were not taken directly from the T & I account, but rather were first transferred to operating account.

NBD argues that the contract was not breached because (1) NBD received its funds from the operating account, not the T & I account, and (2) the T & I funds were not used to "offset" funds loaned to Fidelity.

■ The first argument is without merit. The contract prohibits a setoff using the "funds in the Escrow Custodial [T & I] Ac-

count." NBD argues that the contract cannot be breached if NBD did not receive payment directly from the T & I account. In other words, NBD believes that it was only prohibited under the contract from accepting the T & I funds while the funds were in the T & I account. Having accepted the T & I funds after they had been misdirected, NBD argues that it did not violate the contract. This is too limited a view of the contract. The contract prohibits the use by NBD of the T & I funds. This is true even if the funds are first transferred to an intermediary account. Otherwise, the contract would be ridiculously easy to avoid and provide little, if any, protection for the trust funds.

■ NBD's second argument also fails. NBD asserts that it did not effect a "setoff" under its internal procedures. Nonetheless, funds from the T & I account were given to NBD in repayment of a loan from NBD to Fidelity. A setoff occurs when two entities that owe money to each other apply their mutual debts against each other. The Supreme Court has stated that a setoff requires (1) a decision to effect a setoff, (2) some action accomplishing a setoff, and (3) a recording of the setoff. *Citizens Bank of Maryland v. Strumpf,* —— U.S. ——, ——, 116 S.Ct. 286, 289, 133 L.Ed.2d 258 (1995). To perform a setoff, an entity must intend to permanently reduce the amount of debt owed to it. *Id.*

■ In the present case, there has been a setoff. NBD decided to accept the funds from Fidelity as repayment of debt. NBD did accept those funds and reduced Fidelity's debt by the amount of the payment. This reduction in debt was recorded by NBD and appears in NBD's account statements. Further, NBD released the collateral for those loans when it accepted the funds from Fidelity. This also demonstrates NBD's intent to permanently reduce Fidelity's debt to NBD. Although NBD may not have effected a setoff as defined by NBD, a setoff was effected as defined by the Supreme Court. To the extent that the funds from the T & I account

---

11. NBD does not dispute that GNMA is a third party beneficiary to the letter agreement. GNMA, who owned equitable title to all of the mortgage payments involved in this case, is a third party beneficiary to the contract between Fidelity and NBD because the contract is designed to protect those mortgage payments.

were received by NBD as repayment for NBD's loans to Fidelity, the Letter Agreement was violated.

Therefore, GNMA is entitled to partial summary judgment with respect to the breach of contract claim and should receive $64,033.52, the amount NBD received that can be traced from the T & I account. NBD is not entitled to summary judgment on this claim.

D. Conclusion

NBD's motions for summary judgment on all three claims will be denied. GNMA's motion for summary judgment on all three claims will be granted in part. A partial judgment in the amount of $64,033.52 will be entered in favor of GNMA. The only issue remaining for trial is whether the rest of the misdirected T & I funds may be traced to NBD. GNMA is entitled, as a matter of law, to any further amounts of T & I money that it can trace to NBD.

### *ORDER*

Therefore, it is hereby **ORDERED** that NBD's motion for summary judgment be **DENIED.** It is hereby **FURTHER ORDERED** that GNMA's motion for summary judgment be **GRANTED IN PART.** Partial judgment in favor of GNMA will be entered in the amount of $64,033.52. **SO ORDERED.**

### PARTIAL JUDGMENT

This action having come before the Court, Honorable Paul V. Gadola, District Judge, presiding, and the issues having been duly considered and a decision having been duly rendered,

**IT IS ORDERED AND ADJUDGED** that plaintiff is meritorious on all of its claims and that defendant pay to plaintiff $64,033.52.

It is further **ORDERED** that the clerk serve a copy of this partial judgment by United States mail on counsel for plaintiff and on counsel for defendant.